## GREAT WESTERN FOOD DISTRIBUTORS, Inc. v. BRANNAN.

### No. 10449.

United States Court of Appeals
Seventh Circuit.

Jan. 14, 1953.

Rehearing Denied Feb. 24, 1953.

George L. Siegel and Louis M. Mantynband, Chicago, Ill., Bernard Tomson, New York City, for petitioners.

Neil Brooks, Sp. Asst. to Atty. Gen., Donald A. Campbell, Atty., U. S. Department of Agriculture, Office of Solicitor, Washington, D. C., Frank A. Gallagher, Regional Atty., U. S. Department of Agriculture, Office of Solicitor, Chicago, Ill., J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., Benjamin M. Holstein, Attorney, U. S. Department of Agriculture, Washington, D. C., for respondents.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

Petitioners, Great Western Food Distributors, Inc., Nathaniel E. Hess and Charles S. Borden, seek to have set aside an order of the Judicial Officer of the Department of Agriculture that "all contract markets * * * deny all trading privileges to" petitioners "for a period of

one year." The order followed disciplinary proceedings instituted under the Commodity Exchange Act, 7 U.S.C.A. § 1 et seq., during which petitioners were found to have (1) attempted to manipulate the price of a commodity, eggs, in interstate commerce, for future delivery on or subject to the rules of the Chicago Mercantile Exchange, in violation of 7 U.S.C.A. §§ 9 and 13; (2) attempted to corner a commodity in interstate commerce, for future delivery on or subject to the rules of the Exchange, in violation of 7 U.S.C.A. § 13; (3) cornered the commodity in interstate commerce for future delivery on or subject to the rules of the Exchange, in violation of 7 U.S.C.A. § 13.

The averments of the complaint were in substance as follow. During November and December 1947, the corporate petitioner purchased and held large quantities of December 1947 egg futures on the Chicago Mercantile Exchange, thereby establishing a dominant and controlling "long" position in such futures, which it maintained and strengthened as the close of trading in such futures approached. Coincidentally, it purchased and held large quantities of "cash" eggs, which were deliverable on December futures contracts and, in addition, stood for and received delivery of substantially all of the remaining eggs deliverable in satisfaction of December futures. Thus, by these purchases and deliveries, it was charged that it obtained possession and control of the supply of deliverable eggs in the Chicago and surrounding areas. These eggs were then offered for sale only at prices which made it unduly costly for shorts to purchase them for delivery, with the consequence that the latter were compelled to cover their sales by the purchase of futures at prices fixed by respondent. Thus, the government charged, respondent attained a position whereby it could, and did, demand such prices as it saw fit for "cash" eggs and December futures from persons who had sold such futures and were obligated to deliver eggs or purchase futures in order to perform their contracts. The complaint further averred that these transactions were carried out by the

individual petitioners in their capacity as officers and employees of the corporation and were undertaken for the purpose and with the intent of widening the difference between the price of December 1947 and January 1948 egg future contracts, and increasing or preventing a decrease in the price of eggs deliverable in satisfaction of December futures contracts. Petitioners denied the charges, but the Referee, before whom the initial hearings were held, and, subsequently, the Judicial Officer found that the evidence presented sustained the complaint.

■ The order is attacked on several grounds. The first, that the complaint did not charge an offense subject to administrative disciplinary action under Section 6 (b) of the Act is, we think, without merit. Section 6(b) provides for disciplinary proceedings if a person "is violating or has violated any of the provisions of this chapter * * *". Section 9 makes it unlawful to attempt to manipulate the price of a commodity in interstate commerce; to attempt to corner a commodity in interstate commerce, or to corner any such commodity. The complaint charged petitioners with the very conduct prohibited by this section. There can be no doubt that the averments constituted an offense under Section 6(b) of the act. Cf. Wallace v. Cutten, 298 U.S. 229, 56 S.Ct. 753, 80 L.Ed. 1157.

Nor can it be contended that the factual allegations of the complaint did not spell out a corner of the egg market in December 1947. Generally speaking, a corner is an executed plan of manipulation of prices of a given commodity whereby a trader or group of traders gains control of the supply or the future demand of a commodity and requires the shorts to settle their obligations, either by the purchase of deliverable quantities of the supply or offsetting long contracts, at an arbitrary, abnormal and dictated price imposed by the cornerer. This manipulation may be effected by creation of an artificial demand through purchases of long contracts in excess of the known deliverable supply, see, e. g. Peto v. Howell, 7 Cir., 101 F.2d 353; or by the purchase of all of the available

cash supply, see Baer and Woodruff, Commodity Exchanges (3rd Ed. 1935) p. 146; or by a combination of both, as charged in this complaint. See U. S. v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333.

Petitioners' main attack upon the order is an assertion of inadequacy in the proof adduced by the government to sustain the complaint. The parties have joined in the issue of a completed corner as their focal point of difference. The reason for this common ground is obvious. If the proof warranted a conclusion that petitioners had cornered the egg market on the Chicago Mercantile Exchange in December 1947, it necessarily included adequate proof of attempting to corner and attempting to manipulate. Therefore, we can restrict our consideration of the proof for the time being, at least, to the question of the completed corner.

■ We are told by Section 6(b) of the Act that, upon judicial review of a disciplinary order, the findings of the Judicial Officer shall be "conclusive" if they are "supported by the weight of evidence". In General Foods Corp. v. Brannan, 7 Cir., 170 F.2d 220, 223, this court interpreted this language as follows: " * * * the standard to be employed is something other than the 'substantial evidence rule' controlling in the review of other administrative orders. * * * petitioners are entitled to have the order vacated unless this court concludes that it is sustained by the weight of the evidence, and to us that means the preponderance or greater weight."

However, while this court must examine the sufficiency of the evidence, and this may entail a careful consideration of the proof, see Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, we should be mindful of the practical difficulties and pitfalls presented in attempting to redetermine, from an inanimate record alone, issues such as these here presented. Often the "most telling part" of the evidence is not apparent from the printed page, "for on the issue of veracity the bearing and delivery of a witness will usually be the dominating factors". N. L. R. B. v. Universal Camera Corp., 2 Cir., 190 F.2d 429, 430. Thus, "we may not disregard the superior advantages of the examiner who heard and saw the witnesses for determining their credibility, and so for ascertaining the truth." Ohio Associated Tel. Co. v. N. L. R. B., 6 Cir., 192 F.2d 664, 668.

■ In a proceeding such as this these established admonitions are of particular import for two reasons. First, the intent of the parties during their trading is a determinative element of a punishable corner. Unintentional corners can develop, 7 F.T.C. Report on the Grain Trade 243 (1926), and should not carry the pain of forfeiture of trading privileges. Consequently, the demeanor of the witnesses, as they expound the reasons behind their operations, is of substantial significance in a referee's findings and conclusions. In addition, the technical and complex nature of the charges made necessitated recourse to extensive use of expert testimony, for here, as is often the case in proceedings under regulatory statutes, the evidence is largely of a dual nature: statistical and parol interpretation of the statistics. In the latter aspect the referee again possesses a greatly advantageous position, for, as the several experts testify, he is able to ascertain their grasp and knowledge, their perspective and understanding of the materials presented to them for interpretation. Their conduct on the stand may enhance or belie their status as experts. In short, anyone who has observed witnesses on the stand will know that those "who see and hear witnesses are much better equipped to weigh the evidence and determine the credibility to be extended to those testifying than are the judges of courts of review who do not enjoy the same advantages." Jennings v. Murphy, 7 Cir., 194 F.2d 35, 36.

■ It would seem, then, that the function of this court is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of the fact was justified,

i. e. acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings. To go further is to disregard the "most telling part" of the evidence. N. L. R. B. v. Universal Camera Corp., supra. With this in mind we approach the proof offered in this proceeding.

For purposes of clarity we discuss the evidence under four divisions: (1) petitioner Great Western's long position in the December 1947 futures trading; (2) Great Western's cash supply holdings; (3) the effect, if any, of these matters on the prices prevailing during December 1947, and (4) the intent of petitioners at the time of Great Western's operations.

The complaint first averred, and the Judicial Officer found, that Great Western acquired and maintained a dominant and controlling long position in the December 1947 egg futures market. The evidence on this point, and, as will appear later the other allegations as well, was largely statistical, supplemented by expert analysis and interpretation. It was shown that in mid-November 1947 Great Western entered upon an extensive program of purchasing December futures; that, by December 1, 1947, it held 272, or 33.3%, of the 816 contracts then open on the market; that it maintained this relative position, with slight fluctuations, through December 15, while other interests were disposing of their long holdings, so that, on the 15th, it held 256, or 59.6% of 431 contracts; that it then began to liquidate its holdings, but not with the same speed as other traders in the market, so that, while its numerical position decreased its relative percentage position increased; that, at the close of trading on December 19 it held 179 of 235 longs remaining open and, at the close of trading on December 22, 119 of 153 still open, or 76.2% and 73.9% respectively. Thus, from December 15 through the close of trading in December futures on December 23, Great Western held between 60% and 75% of a still substantial number of open long contracts then on the market. This statistical evidence was undisputed. Consequently, there can be no doubt of the propriety of the finding that Great Western acquired and maintained a dominant and controlling long position in December 1947 egg futures which manifested itself most emphatically subsequent to December 15.

It was alleged that Great Western gained control of the cash supply of eggs available to the shorts for performance of their December 1947 obligations. To determine whether this averment was adequately proved it is necessary first to define the grade of eggs deliverable on the December 1947 contracts. The trading unit for the month was one carlot consisting of 600 cases of 30 dozen eggs or, 18,000 dozen eggs. Par delivery consisted of refrigerator eggs, graded U. S. No. 2 Extras, stored in approved warehouses in Chicago. In addition, under the rules of the Exchange, the shorts could satisfy their obligations by delivery of (1) fresh eggs or, (2) the same grade of refrigerator eggs as above described, stored in approved out of town warehouses. The evidence established that fresh eggs customarily range higher in price than refrigerators and the short was given no premium for their delivery. Consequently, while they were deliverable, fresh eggs were generally not contemplated as part of the supply for these futures transactions. Therefore, we think, they were properly excluded from consideration as part of the available supply.

Out of town refrigerator eggs present a slightly different problem. If these eggs were tendered by a short in satisfaction of his contract he was, under the rules of the Exchange, required to pay the long an equalizing factor of $135 per carlot, plus freight charges to Chicago, which averaged one cent per dozen or $180 per carlot. Thus, the total deduction charged the short averaged $315 per carlot. The government contends, in the face of strong objections by petitioners, that out of town eggs should also be excluded from the available supply because of this required charge, referred to as an "economic impediment". Thus, it is the government's position that we should look only to the Chicago re-

frigerator eggs and petitioners' control thereover to ascertain if this second element of the alleged corner was proved.

Government witnesses testified that, due to the "economic impediment" attached to their delivery, out of town eggs were seldom tendered in satisfaction of a short's obligation on the Chicago Exchange. Petitioners introduced contradictory evidence that during the years 1941–1947, 141 contracts were performed by delivery from out of town supplies. However, these deliveries were but a small part of a total of 3,304 deliveries made during the same period. Consequently, it was not unreasonable, we think, for the Judicial Officer to conclude, as a matter of fact, that out of town eggs are generally not resorted to for satisfaction of futures contracts on the Chicago Exchange.

The justifiable inference from these two facts seems, to us, to be plain: out of town prices · plus freight and differential charges render out of town eggs more costly for delivery on Chicago contracts than local eggs. This being true, out of town eggs are economically excluded from the contemplated available supply, unless, of course, the price of local eggs is raised to the Chicago level of out of towns. But this, it would appear, will not occur unless control of the local supply is acquired by one who intentionally raises the price of Chicago refrigerator eggs to the level of out of towns. This, of itself, would constitute an arbitrary fixing of prices. We conclude, then, that the government's position that out of town eggs should, in view of the "economic impediment", be excluded from the considered available supply, is sound; that this element of a corner, i. e., control of the supply, under these circumstances, can be effectuated by control of the local supply. This is certainly true in the instant proceeding subsequent to 9:00 a. m. December 22, for at that time out of town eggs were, by the rules of the Exchange, excluded from the available supply. Shorts intending to satisfy their obligations by such delivery were obliged to tender their eggs by that time. Thereafter they were restricted to eggs located in Chicago and, as we have seen, due to the premium price of fresh eggs, this meant Chicago refrigerators.

What, then, was Great Western's position in the Chicago refrigerator cash supply during December 1947? During the early part of December petitioner bought heavily of Chicago cash eggs, acquiring 10 carlots on the first and 71 on the third of the month. As of the latter date, it controlled 29.3% of the Chicago cash supply. This inventory was gradually reduced, primarily by sales to out of town purchasers, during the ensuing fifteen days, so that, on December 17, it numbered 49 carlots or 37.6% of the total stocks held in Chicago. On the 17th, petitioner began accepting delivery of cash eggs on its long positions. This, of course, increased its position in the cash supply, with the result that, at the close of trading on the 18th, 19th and 22nd it held 57, 58 and 61 carlots respectively which constituted 43.9%, 48.5% and 51% of the Chicago stocks. This statistical proof was also undisputed by petitioners, and amply justified the conclusion that, subsequent to December 15, Great Western held a controlling position in the available cash supply of eggs deliverable on December futures contracts.

We have, then, a coincidence of Great Western's dominant long position and control of the available cash supply subsequent to December 15. During this period Great Western's potential control of the market was graphically demonstrated by the fact that its long position, coupled with its cash inventory, was in excess of, and eventually almost double that of all other longs and cash holders combined. Furthermore, on December 15, 148 of 408 shorts had no recourse other than Great Western for cash eggs or an offsetting long contract; December 17 found 147 of 358 in that position; December 18, 142 of 329. On December 22, 113 of 230, or almost one-half of the shorts then remaining in the market, were compelled to go to Great Western to satisfy their obligations. Here, then, was credible evidence that petitioner had, by its trading in December 1947, placed itself in such a position that it was

able to dictate effectively to a substantial number of shorts the price at which they could be relieved of their obligations.

Whether the prices were so dictated can best be ascertained by an analysis of the prices prevailing at the time the power existed. The government maintains that abnormal or arbitrary prices were disclosed in three ways: (1) the prices of December futures and cash refrigerator eggs were unusually high in view of the supply and demand situation in December 1947; (2) the spread between December and January futures was abnormally high; (3) the prices of futures and refrigerators were abnormally high in relation to fresh eggs. Let us look at each of these criteria separately.

Evidence was introduced by the government tending to show that the supply of refrigerator eggs in December 1947 was higher than it had been in October and November 1947 and in December 1946. Additional proof submitted tended to establish that the real demand, as opposed to technical demand created by a cornering operation, was lower in December 1947 than in the previously mentioned months. Therefore, the government insisted that, by application of the law of supply and demand, the prices of refrigerator eggs in December 1947, and their corresponding futures contracts, should be lower than those in October and November 1947 and December 1946. Next the government asserted that the expected price pattern did not manifest itself in December 1947; that cash refrigerator eggs and futures prices were in fact higher than in the named months; that, if they were not higher, they did not drop to the proper level and thus, were at an abnormal level.

At this point, however, we find what we consider fatal deficiencies in the government's theory. First, we are not provided with the October and November 1947 prices. Thus, nothing exists but the bare assertion that December prices were abnormally high in relation to the preceding months. Secondly, while the record discloses, in quite a different context, that the December 1946 prices were considerably lower than those prevailing in December 1947, this standing alone is inadequate. We are told nothing of the comparative market conditions prevailing in these two years. Certainly a mere dollar and cent comparison, related solely to supply and demand, is not enough. If the market in 1947 was, on the whole, inflated over 1946, surely the 1947 prices could be higher in spite of a decrease in demand and an increase in supply. Therefore, this finding that the prices of refrigerator eggs and their futures were abnormally high in view of the supply and demand situation cannot be said to be sustained by the weight of the evidence.

The second asserted manifestation of price abnormalcy was the "spread" between December 1947 and January 1948 futures. Historically January futures have sold at a lower price during December than have December futures. The government established that Great Western was engaged in a straddling operation whereby it purchased long in December and sold short in January. The profit to be derived from such a market position lies in widening the spread between these two futures, with the December prices going up in relation to the January prices. This can be accomplished by an increasing December price; a decreasing January price; or, a combination of both.

To prove that an abnormal relationship existed between these futures the government relied primarily upon statistics showing the average spread at the close of December trading during the years 1932–1948 (excluding 1944–1945). This average was 1.85¢ per dozen as compared to 5.94¢ in December 1947. Here, then we are given a comparative from which to work. However, before we can conclude that the 1947 spread was abnormal, it must be established that the 1932–1948 average was "normal". It is here that petitioners challenge the government's underlying premise. Petitioners introduced statistics which tended to show that the average spread at the close of December trading, from 1944 through 1948 was approximately 3.6¢ per dozen as compared to 5.94¢ in December 1947. During the years 1944 and 1945

the spread was in excess of 6¢; in 1946 approximately 2.6¢; in 1948 January futures exceeded December prices by .5¢. These, claim petitioners, are the proper prices with which to compare December 1947, for, in the 1930s the egg market, as all markets, was depressed, with a resultant depression in the December-January spread.

To this the government replies that the 1944 and 1945 prices should be excluded from comparison because during those years price control was in effect. Government witness Beach testified that ceilings were not established for futures prices, but rather on a cash basis only. These ceilings were announced each month. The result was that futures prices were kept at a low level until the ceilings were announced, at which time they rose to the permissible levels. Thus, in December of 1944 and 1945 the ceilings for December sales were announced and December futures rose to that level. However, January ceilings were not yet known so those prices were kept low, thus serving to enhance this spread. An exclusion of the years 1944 and 1945 resulted in an average spread during the 1940s of 2.6¢ per dozen as compared to 5.94¢ in December 1947.

In rebuttal to petitioners' assertion that the 1930s were depression years with a resultant depression in the spread measured in cents, the government introduced statistics which showed the December prices as percentages of the January prices. This approach takes into consideration the widening spread as measured in cents only and tends to give a more accurate reflection of the December-January comparison through depressed and inflated years. These statistics showed that from 1932–1948 December prices averaged 103.3% of January prices; that in 1947 this ratio was 112.4%.

Taking either set of statistics for the years 1932–1948, or employing only the prices during the 1940s, with the proper exclusion of 1944 and 1945, and comparing them with the December-January spread of 1947, it appears that the relationship existant in 1947 was in fact abnormal. Thus, by this criterion the prices of December 1947 futures were abnormal as averred in the complaint.

Finally the complaint charged that the prices of December 1947 futures and refrigerator eggs were abnormally high in relation to the price of fresh eggs at the close of December 1947 trading. This was supported by testimony that, normally, fresh eggs sell at a reasonably constant premium of considerable size over cash refrigerator eggs and refrigerator futures, and that, generally, the prices of cash refrigerator eggs and refrigerator futures will reflect precipitous drops in the prices of fresh eggs. This testimony was corroborated by statistics dealing with these relative prices during the years 1932–1947. These statistics established that the average price of fresh eggs over December refrigerator futures at the close of trading in the future was approximately 4 cents per dozen. The fresh egg premium in 1947 was but .5 cent per dozen. This tended to prove price abnormality in December 1947. Furthermore, during these 14 years, (1942 and 1943 were excluded for want of adequate statistics), whenever a precipitous drop in fresh prices occurred, the refrigerator future reflected it in all instances save six. During the last two weeks of December 1947 trading, the fresh egg prices dropped approximately 7.5 cents per dozen. During that same period the refrigerator futures first dropped 2.25 cents per dozen and then rose about 1 cent per dozen to the point of closing, just .5 cent lower than fresh eggs. This, too, was indicative of price abnormality.

■ The evidence of the government then was adequate to support findings that Great Western had (1) acquired and maintained a dominant "long" position in December 1947 egg futures which it combined with (2) the purchase of a controlling interest in a substantial part of the available cash supply of December 1947 eggs, resulting in (3) abnormally high refrigerator egg and future prices in relation to (a) the price of January 1948 futures and (b) fresh eggs in December 1947. All that remained to be proved to sustain the complaint was that this program was intentionally undertaken.

Government witness Seitz' testimony and official report amply provided such proof. He stated that, during the course of an investigative interview, held with petitioner Hess in early 1948, Hess stated that the December 1947 program was instituted in hope of a widening spread between December and January prices and that December prices were gradually raised by himself until Great Western was able to liquidate its holdings at an increase in the differential of 4½ to 5 cents. Here then was evidence, from which the inference of intent could be readily drawn. It was controverted by Hess, but should we disregard the superior position of the hearing tribunal to resolve this conflict in testimony, we would be disregarding the "most telling part" of the evidence. N. L. R. B. v. Universal Camera Corp., supra. In short, a review of the entire record is convincing that the greater weight of the evidence sustained the Referee and Judicial Officer in their conclusion that petitioner Great Western had cornered the egg market on the Chicago Mercantile Exchange in December 1947.

Petitioners assert that the order of the Judicial Officer was violative of Section 9(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1008. That section provides:

"Except in cases of willfulness * * no * * * suspension * * of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements."

It is said that the order must be set aside because petitioners were not notified in writing of the charges being contemplated against them. Assuming, arguendo, that this section is applicable to proceedings such as this, in view of the evidence that petitioners wilfully violated the act, i. e., that they intentionally set out to widen the spread between December and January futures, its relevance is, by its own terms, excluded in this instance.

Finally, petitioner Borden asserts that the order should not run against him. The evidence disclosed that Hess was vice-president of Great Western and formulated its trading policies. It was he who directed the operations. On the other hand, Borden was manager of the Chicago office and, from his position as floor trader for Great Western, executed many of the transactions which brought about the corner. He was aware of Great Western's position in the market and, in view of his position, there can be little doubt that he was well informed as to the purpose behind the several transactions. Thus it is altogether proper that he, too, be suspended from trading along with petitioners Hess and Great Western. Of course, we have nothing to do with the question of severity of the penalty.

The petition to review is denied.