**VOLKART BROTHERS, INC.,** Volkart Brothers Company, Alfred Boedtker and Kurt Muller, Petitioners,

v.

Orville L. FREEMAN, Secretary of Agriculture, and Thomas J. Flavin, Judicial Officer by Appointment of the Secretary of Agriculture, Respondents.

No. 19020.

United States Court of Appeals Fifth Circuit.

Dec. 5, 1962.

Harry B. Kelleher, New Orleans, La., J. Donald Duncan, New York City, Irving L. Schanzer, Maurice Mound, John C. White, Washington, D. C., for petitioners.

Neil Brooks, Asst. Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., for respondents.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

The order of the Secretary of Agriculture was made through the Judicial Officer pursuant to authority delegated[1] as authorized by Congress.[2] The opinion of the Judicial Officer comprises some fifty pages of the printed record, and is reported in 20 Agriculture Decisions 306. It concludes with the following order:

"Effective May 22, 1961, the registration of Volkart Brothers Company as a futures commission merchant and the registration of Alfred Boedtker as a floor broker are suspended for a period of 15 days.

"Effective May 22, 1961, all contract markets shall refuse all trad-

1. See 10 Fed.Reg. 13769; 11 Fed.Reg. 177A–233; 18 Fed.Reg. 3219, 3648; and 19 Fed.Reg. 74.

2. Act of April 4, 1940, 54 Stat. 81, 5 U.S. C.A. § 516a et seq.

3. Pending judicial review, the Judicial Officer stayed enforcement of that order.

4. Act of September 21, 1922, c. 369, 42 Stat. 998, as amended by the Act of June 15, 1936, c. 545, 49 Stat. 1491, as amended, 7 U.S.C.A. § 1 et seq.

5. "If the Secretary of Agriculture has reason to believe that any person (other than a contract market) is violating or has vio-

ing privileges to Volkart Brothers, Inc., Volkart Brothers Company, Alfred Boedtker and Kurt Muller, for a period of 15 days, such refusal to apply to all trading done and positions held directly by any of the said persons or firms, and also to all trading done and positions held indirectly through persons owned or controlled by them, or any of them, or otherwise."[3]

The New York Cotton Exchange and the New Orleans Cotton Exchange are designated contract markets under the Commodity Exchange Act.[4] Volkart Brothers, Inc., is engaged in merchandising cotton and other commodities and is a member of each of said Exchanges. Volkart Brothers Company is a partnership licensed as a carrying broker on the New York Cotton Exchange. Alfred Boedtker is President of Volkart Brothers, Inc., and a partner in Volkart Brothers Company, and is also a registered floor broker under the Commodity Exchange Act, and a member of each of said Exchanges. Kurt Muller is Vice President of Volkart Brothers, Inc., a partner in Volkart Brothers Company, and a member of the New Orleans Cotton Exchange.

The Judicial Officer found the petitioners guilty of "manipulating" and attempting to manipulate the price of October 1957 cotton futures on the New York Cotton Exchange and on the New Orleans Cotton Exchange in violation of Sections 6(b)[5] and 9[6] of the Commodity Exchange Act.

lated any of the provisions of this chapter, or any of the rules and regulations made pursuant to its requirements, or has manipulated or is attempting to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any board of trade, he may serve upon such person a complaint stating his charges in that respect, to which complaint shall be attached or contained therein a notice of hearing, specifying a day and place not less than three days after the service thereof, requiring such

6. See note 6 on page 54.

The operation of a commodity futures exchange is well described in the amicus curiae brief filed by the New York Cotton Exchange:

"A futures exchange performs a valuable economic function in the public interest. Risks in business must be paid for. They are generally passed on to the consumer. To the extent that they can be eliminated or reduced, the consumer benefits. It is the function of the commodity futures market to eliminate or reduce the risk of price fluctuations in the process by which a commodity moves from grower to consumer. The method whereby this is accomplished using the cotton business as an example, is as follows:

"Contracts on the exchange call for the purchase or sale of cotton for future delivery during a specified month from one to eighteen months from the date the contract is made. A person engaged in the production, manufacture or sale of cotton may take a position on the exchange by buying or selling cotton for future delivery to offset his purchase or commitments in the actual commodity and thus hedge (insure) against price fluctuations. This can be illustrated by the example of a merchant who sells spot cotton for delivery to

person to show cause why an order should not be made directing that all contract markets until further notice of the Secretary of Agriculture refuse all trading privileges to such person, and to show cause why the registration of such person, if registered as futures commission merchant or as floor broker under this chapter, should not be suspended or revoked. Said hearing may be held in Washington, District of Columbia, or elsewhere, before the Secretary of Agriculture, or before a referee designated by the Secretary of Agriculture, which referee shall cause all evidence to be reduced to writing and forthwith transmit the same to the Secretary of Agriculture. Upon evidence received, the Secretary of Agriculture may require all contract markets to refuse such person all trading privileges thereon for such period as may be specified in the order, and, if such person is registered as futures commission merchant or as floor broker under this chapter, may suspend, for a period not to exceed six months, or revoke, the registration of such person. Notice of such order shall be sent forthwith by registered mail or by certified mail or delivered to the offending person and to the governing boards of said contract markets.

"After the issuance of the order by the Secretary of Agriculture, the person against whom it is issued may obtain a review of such order or such other equitable relief as to the court may seem just by filing in the United States court of appeals of the circuit in which the petitioner is doing business a written petition praying that the order of the Secretary of Agriculture be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Secretary of Agriculture and thereupon the Secretary of Agriculture shall file in the court the record theretofore made, as provided in section 2112 of Title 28. Upon the filing of the petition the court shall have jurisdiction to affirm, to set aside, or modify the order of the Secretary of Agriculture, and the findings of the Secretary of Agriculture as to the facts, if supported by the weight of evidence, shall in like manner be conclusive." Title 7 U.S.C.A. § 9.

6. "Any person who shall violate the provisions of sections 6–6e, 6h, or 6i of this title, or who shall manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any board of trade, or who shall corner or attempt to corner any such commodity, or who shall fail to evidence any contract mentioned in section 6 of this title by a record in writing as therein required, or who shall knowingly or carelessly deliver or cause to be delivered for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of commodity in interstate commerce, shall be deemed guilty of a misdemeanor, and upon conviction thereof be fined not more than $10,000 or imprisoned for not more than one year; or both, together with the costs of prosecution." Title 7 U.S.C.A. § 13.

a mill six months from now at a fixed price which gives him a fixed profit based upon current spot prices. He does not now have the cotton and therefore takes the risk of a change in the spot price when he is to acquire it to fulfill his commitment to deliver. To guard against this risk of a change in price, he takes a long position on the futures market of an equivalent amount of cotton (i. e., he makes a contract to purchase cotton for future delivery on the exchange). If the price of spot cotton increases during the six-month period, the price of futures will tend to increase correspondingly and the loss he sustains in having to pay a higher price for spot cotton will be offset by the gain in price on the futures market when he closes out his futures contract at a profit. In another case, the merchant purchases cotton for inventory from a farmer at a fixed price. To avoid the risk of a change in price when he is ready to sell it, he takes a short position on the futures market (i. e., he makes a contract to sell cotton for future delivery on the exchange). If the price of spot cotton decreases, the price of futures will tend to decrease correspondingly and the loss he sustains in the value of his inventory will be offset by his gain on the futures market when he closes out his futures contract at a profit.

"The futures exchange is used by those who grow, manufacture, process, sell and utilize cotton and cotton products and wish to hedge against price fluctuations. Since there are not an equal number of hedgers taking long and short positions on the exchange, speculators are invited into the futures market and for an expected profit they act as insurers for those who deal with the actual commodity.

"For every contract to purchase cotton on a futures exchange there is a corresponding contract of sale.

As the delivery month approaches, contracts are generally offset against each other. A long enters into a contract to sell and his purchase and sale contracts offset each other. A short enters into a contract to purchase and his sale and purchase contracts offset each other. Contracts not thus offset remain 'open' and if open on the last trading day must be performed by the delivery of the actual commodity by the short and receipt and payment therefor by the long.

"Delivery does not mean the physical delivery of actual cotton. It means the delivery of warehouse receipts for cotton inspected, classified and stored in approved warehouses and the transfer of such documents is handled between clearing members of the exchange.

"Contracts on a futures exchange are not made by the parties in interest, but by members of the exchange who enter into contracts on behalf of their customers with other members of the exchange also acting for their customers.

"A contract on a futures exchange may be performed either by offset on the exchange or by delivery and receipt of warehouse receipts for the physical commodity. Most contracts are performed by offset on the exchange in the manner described above.

"The liquidation of futures contracts on an exchange by offset, in the main, instead of by delivery is to be expected because of the manner in which the exchange is utilized. The speculator does not deal in the actual commodity but uses the exchange in the expectation of making a cash profit resulting from fluctuations in prices on the exchange. The hedger, who deals in the commodity, is also generally interested in liquidating his futures contracts on the exchange for cash because any loss he sustains on his spot commitments if the price moves

against him is expected to be offset by his profit on the futures market, and any gains resulting from price changes in the spot market is expected to be offset by a loss on the futures market.

"However, despite the fact that most contracts on futures markets are liquidated by offset, it is well settled that a commodity exchange which did not require a short to deliver at maturity and a long to receive the commodity at maturity would be a gambling institution. The legality of every futures exchange rests on the obligation of the parties to the futures contract to deliver or take delivery of the commodity unless the contract has been liquidated by offset on the exchange.

"*'The intent to deliver or to receive delivery* is thus vital in determining whether or not the transaction is legal. The bylaws of commodity exchanges do not leave this question open to argument or dispute. The exchange contract provides for delivery or acceptance of delivery and neither broker nor customer has any choice in the matter. It is as certain as anything can be that a party who buys or sells a futures contract and does not offset it by a contra transaction will receive the commodity or be called upon to deliver.' "Baer and Saxon, Commodity Exchanges and Futures Trading, p. 305 (1949).

"The Rules of the New York Cotton Exchange specifically provide that futures contracts made on the Exchange are binding until fulfilled by delivery of the cotton and payment therefor, and that a contract entered into with an understanding that it is not to be so fulfilled is forbidden (Rule 3.03(1)).

"Thus, the fundamental principle underlying all commodity exchanges is that a person who buys or sells a futures contract and does not offset it by a contra-transaction on the exchange must receive the commodity or be called upon to deliver it. The fact that most persons who trade on a commodity exchange expect to offset their contracts before the date of delivery or receipt is not a denial of this principle."

The Judicial Officer found that, "The basic facts, or most of them, are not in dispute." He summarized the pivotal facts as follows:

"At the opening of the trading session October 15, 1957, the total open interest on both exchanges was 13,400 bales, i. e., there were unliquidated futures in that amount held by shorts against the same quantity held by longs. On the long side Volkart had 12,100 bales and other longs had 1300 bales. On the short side the 13,400 bales had to be covered before the end of trading October 15, 1957, by the purchase of futures or the delivery of certificated cotton or cotton which was in the process of certification. There were only about 5000 bales of certificated cotton owned by persons other than Volkart. Consequently there were available, without recourse to Volkart, only about 5000 bales of certificated cotton and 1300 bales of long contracts to meet the demand by the short of 13,400 bales. The remaining demand of 7100 bales had to be met out of Volkart's supply of long contracts and out of whatever cotton was in the process of certification.

"Respondents, several of their witnesses and the interveners point to the large stocks of uncertificated cotton in existence October 15, 1957, and seem to take the position that the mere existence of these stocks is proof that there was no artificiality in October cotton futures prices on October 15, 1957, on the New York and New Orleans exchanges. The existence of these large stocks does not negate artificiality in October 15 cotton futures prices. The evidence amply demonstrates that uncertifi-

-cated cotton was not readily available to the shorts, particularly non-merchant shorts, on the last day of trading. Every delivery by means of a deliverer's class certificate on the October 1957 future on both exchanges was by a merchant short who had possession of the cotton on or prior to October 14, 1957. There was no practicable alternative for a short on October 15, 1957, who did not have cotton, but to pay the price to get out. This meant for most shorts who did not have cotton to deliver not less than the price fixed by the concentrated controlling long interest with the consequence that prices advanced."

The last day for trading in the October 1957 cotton futures on the New York Cotton Exchange and on the New Orleans Cotton Exchange was October 15, 1957. It was also the "last notice day," i. e., the last day on which a notice of intention to deliver cotton could be issued. October 22, 1957, was the last day on which delivery of cotton on the October futures could be made. A contract was in default if a notice of intention to deliver was not issued by the end of trading on October 15 and was not satisfied by delivery of the commodity on or before October 22.

The rules of each Exchange provide for penalties in the event of a default; e. g., a member found guilty of intentional default may be expelled from the Exchange, and if the default is unintentional the party in default is subject to a penalty of ¼ cent per pound on the weight of the cotton involved in the default. A defaulting party is liable for any damages caused to the party or parties on the other side of the contract.

The alleged manipulation or attempt to manipulate occurred solely on the last day for trading on the Exchanges, October 15, 1957. Up to that time it is not claimed that the petitioners had committed any illegal act. The respondents claim that on that date the petitioners manipulated the market price of the October 1957 cotton futures by means of

(1) their controlling "long" position on the cotton exchanges, (2) the insufficient supply of cotton eligible and available to the shorts for delivery by them on their futures contracts during the period of manipulation, and (3) the establishment of an abnormal or artificially high price by the petitioners in liquidation of their futures contracts.

The petitioners, in response to means (1) charged by the respondents, admit that their "long" position on the cotton exchanges on October 15, 1957, was a dominant position, but deny that it was "controlling" in the sense that it was capable of use and was used for manipulative purposes. They further insist that their dominant "long" position was not intentionally contrived for the purpose of effecting an arbitrary increase in the prices.

In response to means (2) charged by the respondents, the petitioners, supported by the New York Cotton Exchange, appearing as amicus curiae, strongly dispute that the date October 15 is the proper time factor to be considered on this issue, and emphasize the fact that there were millions of bales of cotton available in the Country, of which approximately 1,250,000 bales were stored in the port warehouses specified as delivery points for "certificated cotton." They insist that the shorts, through their brokers, could have obtained cotton at the ports and placed it in process of certification on October 13 or 14th. The New York Cotton Exchange, appearing amicus curiae, emphatically urges:

"  *   *   *   that the decision of the Judicial Officer will result in the destruction of the principles under which a futures exchange should operate and the consequent disruption in business attendant thereon; for if that decision is sustained a license will have been given to all traders holding short positions to disregard their obligations to deliver under futures contracts, and holders of long positions will be obligated to protect them against the price increase naturally resulting from the

technical situation thus created by them. And, this without any regulation of the Department adopted under power conferred by the Act."

The petitioners also deny means (3), that they established abnormal or artificially high prices. They point especially to the fact that the Control Committee of the New York Cotton Exchange, which was in excellent position in the light of its confidential information of the names of the customers who held the long and short positions, having been advised of the prices at which petitioners were willing to liquidate, did not find them sufficiently high to request merchant members of the Exchange to place selling orders in the futures market. The respondents' figures show petitioners' total sales on October 15 as $1,833,040.00, and that that was $21,230.00 more than the amount which would have been realized on the basis of prices existing at the close of business on the previous day, October 14, 1957.

■■■ In our view, decision of the case turns largely on the meaning of the word "manipulate" as used in Section 6(b) (quoted in n. 5, supra) and Section 9 (quoted in n. 6, supra) of the Commodity Exchange Act. The same word, "manipulate" is employed both in Section 6(b), which relates to administrative proceedings, and in Section 9, which defines a criminal offense. There being no statutory definition of "manipulate," the term must be construed as used in its known and ordinary signification.[7] The Judi-

cial Officer quoted the testimony of Mr. Arthur R. Marsh, former President of the New York Cotton Exchange, given in Cotton Prices, Hearings before a Subcommittee of the Committee on Agriculture and Forestry, U. S. Senate, 70 Cong., 1st Sess., pursuant to Senate Resolution 142 at pp. 201–202, as follows:

"Manipulation is, 'any and every operation or transaction or practice * * * calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets. If a firm is engaged in manipulation it will be found using devices by which the prices of contracts for some one month in some one market may be higher than they would be if only the forces of supply and demand were operative. * * * Any and every operation, transaction [or] device, employed to produce these abnormalities of price relationship in the futures markets, is manipulation.' "[8]

Certainly the term "manipulate" means more than the charging of what some may consider to be unreasonably high prices. Otherwise, there would be grave doubt as to the constitutionality of the statutes.[9]

As Mr. Marsh's testimony indicates, there must be a purpose to create prices not responsive to the forces of supply and demand; the conduct must be "calculated to produce a price distortion." There may be a squeeze[10] not planned.

7. Old Colony R. Co. v. Commissioner of Internal Revenue, 1932, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484; Miller v. Robertson, 1924, 266 U.S. 243, 250, 45 S.Ct. 73, 69 L.Ed. 265; Maillard v. Lawrence, 16 How. 251, 261, 14 L.Ed. 925; United States v. Merchants National Bank of Mobile, 5 Cir., 1958, 261 F.2d 570, 575.

8. See also United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 221–223, 60 S.Ct. 811, 84 L.Ed. 1129; Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 39, 43 S.Ct. 470, 67 L.Ed. 839; Great Western Food Distributors v. Brannan, 7 Cir., 1953. 201 F.2d 476, 478.

9. In United States v. L. Cohen Grocery Co., 1921, 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L.Ed. 516, a statute making it unlawful "for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" was held unconstitutional because it was not "adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them."

10. The term "squeeze" was thus defined by Senator Pope when he was in charge of the bill which was enacted as the Commodity Exchange Act:

"Squeeze (congestion): These are terms used to designate a condition in

or intentionally brought about by the petitioners. Such a squeeze should not result in their being punished.

The Report of the Federal Trade Commission on the Grain Trade (1926), pages 284–285, recognizes that a squeeze from which a long purchaser profits is not necessarily illegal:

> "A 'squeeze' suggests a much milder situation than a corner. It means that there is too large a line of short sales out and that the short sellers have been somewhat obstinate in carrying their trades into the delivery month, or possibly that the various long interests are unduly or unexpectedly obstinate in reducing their lines during the delivery month. A squeeze does not imply one long holder nor conspiracy among the long interests to enhance the price. A large long interest may exist which has not been built up for manipulative or even speculative purposes, but as a hedge, and maybe a hedge on which the buyer expects to take delivery to meet cash grain commitments." 7 FTC Report, pp. 284–285.

Likewise, in Baer & Saxon, Commodity Exchanges and Futures Trading (1949) it is stated: "A squeeze is a relatively small corner, occurring in deliveries for some one month or some one grade. Some—or, in fact, most—squeezes are inevitable on both the physical and the exchange markets and are not the result of illegal manipulation."

■ Even in the case of an unplanned corner, the longs would not be guilty of manipulation. As said in the leading case of Great Western Food Distributors v. Brannan, 7 Cir., 1953, 201 F.2d 476, 479: " * * * the intent of the parties during their trading is a determinative element of a punishable corner. Unintentional corners can develop, 7 F.T.C. Report on the Grain Trade 243 (1926), and should not carry the pain of forfeiture of trading privileges." [11]

■ In brief, before the order punishing the petitioners can be sustained, it must appear not only that they profited from a squeeze, but that they intentionally brought about the squeeze by planned action.

■ In most, if not all of the cases in which a trader has been adjudged guilty of manipulation, it has effectively controlled the spot commodity to the extent necessary to enable it to convert its dominant long futures position into an illegal corner or squeeze.[12] In the present case, the petitioners did not control the available supply of "certificated cotton." Of more importance, we do not agree that the 1,250,000 bales of uncertificated cotton stored at ports designated as delivery points can be disregarded in determining the size of the available supply upon the simple finding that on October 15 the shorts did not have time to purchase the proper grade and class of cotton and secure its certification. Actually, more than 23% of the cotton delivered on October 1957 futures (1192 out of 5100 bales) was tendered on deliverer's class. Conceding that the shorts who tendered that cotton procured it earlier than October 15, it is nonetheless true that all of the shorts had the

maturing futures where sellers (hedgers or speculators), having waited too long to close their trades, find there are no new sellers from whom they can buy, deliverable stocks are low, and it is too late to procure the actual commodity elsewhere to settle by delivery. Under such circumstances and though the market is not cornered in the ordinary sense, traders who are long hold out for an arbitrary price." 80 Cong.Rec. 8089.

11. See also The Cottonseed Oil Futures Market, Department of Agriculture (1949), pp. 21–29; Hoffman, Future Trading Upon Organized Commodity Markets in the United States (1932) 313.

12. See Great Western Food Distributors v. Brannan, 7 Cir., 1953, 201 F.2d 476; General Foods Corporation v. Brannan, 7 Cir., 1948, 170 F.2d 220; G. H. Miller & Co. v. United States, 7 Cir., 1958, 260 F.2d 286; Peto v. Howell, 7 Cir., 1938, 101 F.2d 353; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923).

same opportunity. The petitioners can be held to a purpose to create prices not responsive to the forces of supply and demand only upon the assumption that the shorts should not be held to their contract obligation to deliver the cotton. Unless the shorts are to be excused from the performance of their contracts and from the exercise of due diligence to that end, the ample supply of uncertificated cotton must be considered as available to them. For the respondents to proceed upon the assumption that the shorts should not be required to deliver at maturity would be to put them in the position of regulating a gambling institution rather than a legitimate futures exchange. That, of course, was not the intention of the statutes (see n. 5 and n. 6, supra) prohibiting manipulation.

In our opinion the weight of the evidence [13] does not support the findings that petitioners manipulated or attempted to manipulate futures prices as charged in the complaint. The order is therefore set aside.

Order set aside.

Cameron, Circuit Judge, dissented.

---

13. See 7 U.S.C.A. § 9, quoted in n. 5, supra, and the discussion of the scope of judicial review in Great Western Food

Distributors v. Brannan, 7 Cir., 1953, 201 F.2d 476, 479, 480.