**APEX OIL COMPANY, Plaintiff,**

v.

**Joseph DiMAURO, et al., Defendants.**

**No. 82 Civ. 1796 (JMW).**

United States District Court,
S.D. New York.

April 17, 1989.

Cadwalader, Wickersham & Taft, New York City, for plaintiff; Richard J. Wiener, Pamela R. Chepiga, Jeffrey Q. Smith, of counsel.

Pollack & Kaminsky, New York City, for defendants Joseph DiMauro, Triad Petroleum, Inc. and TIC Commodities, Inc.; Martin I. Kaminsky, Edward T. McDermott, of counsel.

Shea & Gould, New York City, for defendants Coastal Corp. Coastal States Market, Inc., Belcher Oil Co., Belcher Co. of New England, Inc., counterclaim plaintiff and counterclaim defendant Belcher New Jersey, Inc.; Michael Lesch, Adam Gilbert, Karen S. Frieman, Yee Wah Chin, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant New York Mercantile Exchange; William Hegarty, Peter Leight, Kathy Silberthau, of counsel.

Nutter, McClennen & Fish, Boston, Mass., for defendants Northeast Petroleum Industries, Inc. and Northeast Petroleum Corp.; Neil Motenko, T. Christopher Donnelly, Lisa Wood, of counsel.

Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for defendants Stinnes Corp. and Stinnes Interoil, Inc.; Donald E. Egan, Lee Ann Watson, David K. Schmidt, of counsel.

Brenner, Saltzman, Wallman & Goldman, New Haven, Conn., for defendant George E. Warren Corp.; C. David Goldman, David Schaefer, James C. Graham, Marc R. Cohen, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Julian Raber; Julius Berman, Phillip A. Geraci, of counsel.

Stein, Bliablias, McGuire & Pantages, Livingston, N.J., for defendant Eastern Oil of New Jersey; Kenneth McGuire, of counsel.

## OPINION

WALKER, District Judge:

### INDEX TO THE OPINION

I. PROCEDURAL HISTORY........................................... 591
II. FACTS ......................................................... 592
III. BELCHER'S MOTION FOR SUMMARY JUDGMENT
 A. Introduction ............................................ 593
 B. Standard for Summary Judgment.......................... 594
 C. Claims under § 1 of the Sherman Act .................... 594
 1. Count One........................................... 596
 2. Counts Two and Three .............................. 597
 D. Claim under § 2 of the Sherman Act (count four)........... 599
 E. Claim under the Commodities Exchange Act (Count 5) ....... 601
 F. Conclusion as to Belcher's Summary Judgment Motion ....... 603
IV. APEX'S MOTION TO STRIKE BELCHER'S AFFIRMATIVE DEFENSES...................................................... 603
V. APEX'S MOTION TO DISMISS BELCHER'S COUNTERCLAIMS
 A. Introduction ............................................ 605
 B. Inequitable behavior and violation of the CEA ............ 606
 C. Common law fraud ...................................... 607
 D. Martin Act violation .................................... 607
 E. Monopolization.......................................... 608
VI. APEX'S AND THE EXCHANGE'S CROSS-MOTIONS FOR SUMMARY JUDGMENT ON THE EXCHANGE'S COUNTERCLAIMS
 A. Common Law Misrepresentation ......................... 608
 B. Attorney's Fees......................................... 610
VII. SUMMARY OF CONCLUSIONS .................................. 611

---

### I. PROCEDURAL HISTORY

On August 8, 1986, this Court, in an opinion reported at 641 F.Supp. 1246, dismissed the complaint in all respects as to all defendants because, *inter alia*, the Court concluded that plaintiff Apex Oil Company ("Apex") had failed to submit sufficient evidence supporting its allegations of conspiracy among eighteen defendants. On appeal, the Second Circuit affirmed in part and reversed in part. 822 F.2d 246 (2d Cir.1987). Specifically, the Second Circuit affirmed all of this Court's holdings except for its conclusion that there was no material factual dispute concerning the existence of a conspiracy among three of the defendants. On that score, the Court of Appeals held that there existed an issue of fact as to whether Belcher [1] had conspired with Northeast Petroleum Corporation and Northeast Petroleum Industries, Inc. (collectively, "North-

---

1. "Belcher" is the Coastal Corporation, Coastal States Marketing, Inc., Belcher Oil Company, The Belcher Company of New York, Inc., Belch-er New England, Inc., and Belcher New Jersey Inc.

east") and Global Petroleum Corporation ("Global").[2]

Contrary to the assertions of Apex, the Court of Appeals did not address either the purpose or the effect of any such conspiracy. Defendants' motions to this Court had not been directed to such questions as whether *per se* or Rule of Reason liability was involved in the Sherman Act § 1 claims or whether there was evidence of a specific intent to monopolize in the Sherman Act § 2 claims; defendants solely challenged the existence of any common understanding. Thus, the Court of Appeals' opinion narrowly focused on "whether there is an issue of fact as to the existence of a conspiracy." 822 F.2d at 252. Further, although Apex alleged numerous conspiracy objectives in the amended complaint, the Second Circuit did not examine each independently. Rather, once the Court of Appeals concluded that there was a genuine issue of material fact regarding the existence of a conspiracy between Belcher, Northeast and Global, it reversed this Court's opinion as to all the conspiracy claims as to these three defendants. Before the Second Circuit issued its opinion, Apex settled its claims against Global and Northeast. Belcher, who is the only remaining defendant in this action, now moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the reinstated claims on the grounds that, even assuming the existence of a common undertaking, there is no genuine material issue of fact that its purposes were unlawful or that any anticompetitive effects resulted from any common actions.

Apex cross-moves both for summary judgment on the counterclaims asserted by Belcher and to strike all of Belcher's affirmative defenses. Apex and the New York Mercantile Exchange (the "Exchange"), formerly a defendant in this action, cross-move for summary judgment on the Exchange's counterclaims against Apex.

## II. FACTS

The facts underlying this action and the intricacies of the commodities futures market have been discussed in considerable detail in both the opinion of the Court of Appeals and this Court. Here the Court limits itself to a brief recitation of the facts concerning the pending motions.

In early 1982, the parties to this action were players in the commodities futures market for No. 2 heating oil. In an options market, one takes either a "long" or "short" position with respect to the contract being sold, the longs agreeing to purchase and the shorts agreeing to sell a specified quantity of the subject matter of the contract at a negotiated price and at a definite date in the future. In this case, each short contract for No. 2 heating oil represented a promise to deliver 1000 barrels or 42,000 gallons of oil in New York harbor.

Except for the price of the oil, all aspects of an oil futures contract are subject to uniform terms established by the Exchange. In most cases, the contracts are not satisfied by actual delivery of the oil; rather, the contract is liquidated when the long or the short sells or buys an equal number of short or long positions before the close of trading in that contract, here January 29, 1982. This case, however, concerns unliquidated oil contracts for which delivery was required.

Once trading in futures contracts for a given month closes, the Exchange steps in to coordinate delivery of the oil by the outstanding shorts to the remaining longs by matching each long and short contract. However, there are methods by which actual delivery may still be avoided, including a "book transfer," whereby the delivery obligation is extinguished by transfer of ownership of the oil without a physical transfer of the product. On an agreement to "exchange futures for product" ("EFP") by whereby a new contract to deliver oil on the wet market is substituted for the delivery obligation. Unless one of three options is chosen, actual delivery must occur to satisfy the short's contractual obligation. Otherwise, Exchange rules provide for substantial default penalties.

2. The Court refers to Global, Northeast, and Belcher collectively as the "long defendants."

After trading in February 1982 oil contracts closed on January 29, 1982, Apex held the short position on 4,378 out of 4,906 outstanding contracts. Northeast held 748 long contracts, Global held 362 contracts, and Belcher held 315 contracts.

As required by Exchange rules, Apex selected delivery locations on February 1. Although Apex was entitled by Exchange rules to designate several locations for delivery and to allocate the contracts to those locations as it saw fit, it elected instead to satisfy almost all contracts through delivery at the GATX terminal in Carteret, New Jersey. The Exchange then designated Apex to satisfy the contracts held by Global, Northeast, and Belcher, as well as other entities dismissed from the case. To facilitate delivery, each long was required by Exchange rules to nominate a delivery date and method by 4:30 p.m. on February 5.

The Exchange rules governing the nominating process grant a long complete discretion to demand the date and method of delivery it desires. As noted, if the matched short is unable to satisfy the long's demands, the long may recover substantial default penalties. Nevertheless, longs are typically flexible in dealing with their matched short and the short is frequently excused from its obligation to deliver by a particular method on a particular date in favor of a mutually-agreed alternative. In addition, a long will often spread out nominations over the delivery period depending on its need for oil balanced against the cost of storage.

The disputes in this case largely are based upon the way the long defendants nominated the February 1982 oil contracts for delivery. Apex alleges that the long defendants conspired to nominate for delivery between February 6 and 8. Belcher, in fact, nominated to receive delivery of oil by barge for all 315 of its contracts at 12:01 a.m. on February 6, the earliest possible moment to receive delivery. Northeast nominated 145 contracts for delivery on February 6 and 270 for February 8. Global nominated February 6 as the delivery date for 212 of its contracts, February 7 for 72 contracts, and February 8 for 78 contracts.

Although Apex asked the long defendants to alter delivery dates and methods, the long defendants either ignored the requests or rejected them. Eventually, however, Apex managed to avoid default and fulfill its contractual obligations. Nevertheless, Apex only accomplished this at considerable expense since the price it had to pay to purchase oil on the wet market or to effectuate book transfers was significantly higher than it had been only days earlier. Indeed, the costs it incurred to meet its contractual obligations form the basis of Apex's claim for antitrust damages before trebling.

### III. BELCHER'S MOTION FOR SUMMARY JUDGMENT

#### A. *Introduction*

Apex's amended complaint alleges violations of both federal and New York State antitrust laws, as well as the Commodities Exchange Act ("CEA"). The first three claims of the amended complaint are based on Section One of the Sherman Act, 15 U.S.C. § 1.[3] Count one pleads a conspiracy to nominate for early delivery for the purpose of fixing prices; count two alleges that the long defendants conspired to refuse to sell oil to Apex and to modify their nominations; and count three alleges that the long defendants conspired to induce others not to sell oil to Apex. The fourth count alleges that the long defendants conspired to monopolize the market for oil available for delivery in early February 1982 in violation of Section Two of the Sherman Act.[4] Finally, count five alleges that the long defendants violated §§ 9(b) and 13(a) of the CEA, 7 U.S.C. §§ 13(b) and

---

3. The section provides that "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ...is declared to be illegal...."

4. Title 15 U.S.C. § 2 Two provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ...shall be deemed guilty of a felony...."

13c(a), by attempting and causing a manipulation of oil prices or a corner and/or squeeze of the market for oil available for delivery in New York Harbor during early February 1982.[5]

Each of the causes of action against Belcher requires, in addition to proof of a conspiracy, the establishment of at least one further element. The thrust of Belcher's instant motion is that as a matter of law Apex cannot establish these additional elements and that the claims against Belcher must be dismissed notwithstanding the Court of Appeals' conclusion that the evidence of conspiracy raises a material factual issue.[6]

## B. *Standard for Summary Judgment*

The Federal Rules authorize summary judgment where "there is no genuine issue as to any material fact ..." Fed.R.Civ.P. 56(c). A genuine dispute exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Although the burden is on the moving party to show that no relevant facts are in dispute, *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980), the nonmoving party may not rely simply "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Further, if the evidence supporting the nonmoving party's claims is meager, the moving party may simply point "out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Thus, this Court's responsibility in deciding a summary judgment motion is "to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11.

## C. *Claims Under Section One of the Sherman Act*

Although the language of the Sherman Act is broadly worded, the judiciary has interpreted the statute to prohibit only unreasonable restraints of trade. *See, e.g., Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2468, 73 L.Ed.2d 48 (1982). Over the years, two tests have been employed to determine whether challenged acts constitute an unreasonable restraint of trade: the Rule of Reason and the *per se* rules. Although the difference between these approaches has become blurred in light of recent Supreme Court rulings,[7] it is necessary to identify the distinguishing characteristics of each approach before analyzing the behavior challenged here.

Central to both approaches is an overriding emphasis on the "competitive significance" or impact of the challenged actions. *National Society of Professional Engineers v. United States*, 435 U.S. 679,

---

**5.** All other claims in the amended complaint were dismissed previously. 822 F.2d at 261.

**6.** Before the Court discusses each of the motions at issue here, some clarification of the somewhat opaque position taken by Apex in its amended complaint and motion papers is necessary. Although Apex alleges three distinct conspiracy objectives in violation of § 1 of the Sherman Act, it frequently treats them as one conspiracy to fix prices. *See, e.g.,* Apex's memorandum in opposition at 19. Indeed, Apex characterizes counts two and three as the "overt acts of the conspirators in furtherance of the conspiracy [to fix prices]." *Id.* at 18. Further, while count two alleges a concerted refusal to sell oil to Apex, that claim is characterized in the motion papers as a refusal to deal with Apex

on reasonable terms. While the Court takes a generous approach to this confused complaint, its drafters should be aware of its serious shortcomings. It would be a needless waste of time to require Apex to amend its complaint; nevertheless, the burden placed on the Court by the inartfully drafted pleadings could have been avoided.

**7.** *See, e.g., National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 2961 n. 26, 82 L.Ed.2d 70 (1984) ("there is often no bright line separating per se from Rule of Reason analysis"); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The decision whether to apply the Rule of Reason or the *per se* rule is a question of law even though it is "predicated on a factual inquiry into the restraint's competitive effect." *National Bancard Corp. v. Visa U.S.A., Inc.,* 779 F.2d 592, 596 (11th Cir.1986); *Gregoris Motors v. Nissan Motor Corp. in USA,* 630 F.Supp. 902, 906 (E.D.N.Y.1986).

■ The Rule of Reason is the approach typically employed to judge acts allegedly in violation of the Sherman Act. This approach requires "the factfinder [to] weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The Rule focuses "directly on the challenged restraint's impact on competitive conditions." *Professional Engineers,* 435 U.S. at 688, 98 S.Ct. at 1363. When this test is applied, the plaintiff must first demonstrate that the alleged improper behavior has an anticompetitive effect on the relevant market, frequently a difficult burden to sustain since the antitrust laws are concerned only with acts that harm "competition, not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977); *International Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 793 (2d Cir.), *cert. denied* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed. 2d 676 (1987). Thus, behavior that hurts or even destroys a competitor is not illegal under the Sherman Act unless it also adversely affects competition. Further, acts that may be tortious, fraudulent, or violative of contracts between the parties do not, without more, fall within the ken of the antitrust laws. *See, e.g., Falstaff Brewing Co. v. Stroh Brewery Co.,* 628 F.Supp. 822, 828 (N.D.Cal.1986); *Richard Hoffman Corp. v. Integrated Building Systems,* 610 F.Supp. 19, 23–24 (N.D.Ill. 1985).

■ If the plaintiff cannot prove an anticompetitive effect, the complaint fails as a matter of law to state a cause of action under the antitrust laws. *United States Football League v. National Football League,* 842 F.2d 1335, 1360 (2d Cir.1988); *Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 729 (7th Cir.1986). Once plaintiff has made such a showing, however, the burden shifts to the defendant either to justify its acts or to demonstrate the precompetitive results of the challenged behavior. *NCAA,* 468 U.S. at 113, 104 S.Ct. at 2966. If the defendant discharges that burden, the factfinder must determine, in light of all the evidence, whether the challenged practice is unreasonable.

When scrutinizing challenged behavior under the Rule of Reason, the Supreme Court has instructed lower courts to examine the "facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *United States v. Topco Associates,* 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The relevant market must first be defined and analyzed before examining the alleged anticompetitive effects. *Hayden Publishing Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 69–70 (2d Cir.1984); *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n,* 641 F.Supp. 1179, 1189 (S.D.N.Y. 1986) ("The first issue in any rule of reason analysis is to define the relevant market in which the competitive impact of the defendant's actions are to be examined."). Despite the significant costs entailed by analysis under the Rule, the balancing inherent in the Rule provides needed flexibility to ensure that only those practices meant to be condemned by the Sherman Act are held unlawful.

■ The Supreme Court has characterized as *per se* violations of the Sherman Act certain types of conduct so destructive of competition that they almost always result in unreasonable restraints of trade. Such characterization, however, is reserved for "manifestly anticompetitive" practices. *Continental T.V.,* 433 U.S. at 50, 97 S.Ct. at 2557; *see also Northern Pacific,* 356

U.S. at 5, 78 S.Ct. at 518. For example, price fixing, tying arrangements, horizontal group boycotts, and division of markets have typically been considered *per se* violations of the Sherman Act. The primary distinction between the Rule of Reason and the *per se* approach is that no showing of anticompetitive effect is required under the latter—the proscribed types of conduct are irrebuttably presumed to be violations of the Sherman Act. Like the Rule of Reason, however, the core of the *per se* approach is the effect of behavior on competition, and to determine whether certain behavior falls within a *per se* category, courts typically concentrate on the purpose of that conduct because it "tends to show effect." *Broadcast Music*, 441 U.S. at 19, 99 S.Ct. at 1562.

The Supreme Court has been reluctant to create new categories of *per se* violations, holding that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations...." *Topco Associates*, 405 U.S. at 607–08, 92 S.Ct. at 1133. *Accord, White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). Indeed, the Supreme Court has cautioned against an "unthinking application" of the *per se* categories:

> [E]asy labels do not always supply ready answers ... Literalness is overly simplistic and often overbroad ... it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label '*per se* price fixing.' That will often, but not always be a simple matter.

*Broadcast Music*, 441 U.S. at 8–9, & 13 n. 24, 99 S.Ct. at 1556–57, & 1559 n. 24. Typically, therefore, it is necessary to scrutinize a challenged practice and the industry affected before deciding whether the Rule of Reason should be applied or the practice condemned as a *per se* violation. *See, e.g., NCAA*, 468 U.S. at 104 n. 26, 104 S.Ct. at 2961 n. 26 ("Indeed, there is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct.").

In sum, analysis under the Sherman Act centers upon the challenged practice's effect on competition. If that practice falls within one of the categories considered *per se* unlawful, no further inquiry is required. Otherwise, the practice must be judged under the Rule of Reason.

### 1. Count One

The first count of the amended complaint alleges that the long defendants conspired to nominate for early delivery for the purpose of and with the effect of raising prices for No. 2 heating oil on the wet market in early February; accordingly, Apex argues, the *per se* rule applies to the alleged conspiracy. Belcher, however, argues that the Rule of Reason must be applied to the long defendants' conduct since the effect of the alleged conspiracy on prices was indirect and no showing has been made that its purpose was to fix prices. Further, Belcher contends that even under Rule of Reason analysis, the claim must be dismissed because Apex has failed to show any anticompetitive effect on the relevant market.

■ The Court first concludes that the *per se* rule is inapplicable to the facts as presented so far. Apex wrongly concludes that the mere talismanic invocation of the term "price-fixing" in its complaint is sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir.1984), *cert. denied* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). An illegal price-fixing conspiracy is one "formed for the purpose and with the effect of raising ...or stabilizing the price of a commodity ..." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). While the means used to fix prices may be indirect, courts have not applied the *per se* rule to instances of constructive price-fixing, that is, if the purpose of the alleged conspiracy is not price-fixing, but prices are nevertheless affected by the challenged behavior, that behavior must be judged under the Rule of Reason. *See, e.g., United States v. Nu–Phonics,*

*Inc.,* 433 F.Supp. 1006, 1012 (E.D.Mich. 1977); *Arizona v. Cook Paint and Varnish Co.,* 391 F.Supp. 962 (D.Az.1975), *aff'd* 541 F.2d 226 (9th Cir.1976), *cert. denied* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977).

The Court agrees that Apex has submitted insufficient facts to conclude at this point that a conspiracy was formed *for the purpose of price-fixing.* Indeed, the facts presented by Apex are at least equally susceptible to an interpretation that Belcher, Northeast and Global did not conspire to fix prices but rather to squeeze Apex so that it would either default on its contracts or have to purchase oil on the wet market at whatever price prevailed. The fact that Apex's distress was known to the market at large, which reacted the way any seller's market would, is not conclusive proof of price-fixing punishable under the *per se* rule. Belcher's behavior, therefore, is to be tested by the Rule of Reason.

■ The Rule of Reason, however, is a test which, as applied to the facts of this case as known, demands resolution by a factfinder after trial and not by this Court on a summary judgment motion. Should a factfinder conclude that a conspiracy existed between Belcher and others, it might also conclude that such conspiracy produced an anticompetitive effect on the market. Belcher and others are alleged, in effect, to have agreed to restrain themselves from proceeding according to their settled patterns of behavior of business in the oil futures market, foregoing otherwise optimal delivery schedules and locations, in order to induce an artificial shortage and consequent price increase in the wet market. While Apex did find all the oil it needed in order to fulfill its obligations, Apex has alleged that for at least a short period of time its ability to find that oil was in doubt and that, during this period, the price of oil did increase significantly and rapidly after the early nominations. Whether an anticompetitive effect actually occurred or was sufficient to warrant the condemnation of the anti-trust laws is uncertain; however, resolution of the issue is for the factfinder and not the Court on this

motion. Belcher's motion for summary judgment on count one is denied.

The denial of the motion on count one should not be considered cause for celebration by Apex, however. Apex has barely averted summary judgment on the question whether the long defendants' conduct had an anti-competitive effect on the market.

### 2. *Counts Two and Three*

The Court treats together Apex's broadly worded and illdefined second and third counts of its amended complaint. Count two alleges that the long defendants and "other co-conspirators" concertedly refused to "sell, loan, trade or otherwise transfer No. 2 Heating Oil to [Apex]," for the purpose of causing the price of the oil to rise, thereby rendering Apex unable to meet its contractual obligation to defendants. Count three alleges that Belcher and others induced or attempted to induce other potential oil suppliers not to supply oil to Apex, again for the purpose of causing the price of oil to rise.

Apex argues that the actions by Belcher and others constituted a group boycott, a *per se* violation of the Sherman Act. Belcher, of course, contends that the Rule of Reason is the appropriate test by which to judge the alleged conspiracy, and that once that test is applied, the claim must be dismissed for Apex's failure to demonstrate any anticompetitive effects of the alleged boycott. The Court concludes that the Rule of Reason must be applied to counts two and three and that, again, Apex has made a barely sufficient showing to withstand the motions for summary judgment. Consequently, the Court denies Belcher's motions to dismiss the second and third counts of the complaint.

" 'Group boycotts' are often listed among the classes of economic activity that merit *per se* invalidation under § 1 [of the Sherman Act]". *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 293, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (citations omitted); *see also United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed. 2d 415 (1966); *Klor's, Inc. v. Broadway–*

*Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). However, what behavior constitutes a horizontal group boycott deserving of *per se* condemnation under the Sherman Act has been the source of considerable confusion in recent years. *See, e.g., Northwest Stationers,* 472 U.S. at 294, 105 S.Ct. at 2619 ("Exactly what types of activity fall within the forbidden category is, however, far from certain...Some care is therefore necessary in defining the category of concerted refusals to deal that mandate *per se* condemnation"); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977) ("departure from the Rule-of-reason standard must be based upon demonstrable economic effect rather than... upon formalistic line drawing."); *U.S. Football League,* 842 F.2d at 1372; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210 (D.C.Cir.1986), *cert. denied* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1383–87 (9th Cir.), *cert. denied* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). The Supreme Court has warned that courts should not adjudicate allegations of boycotts under section one of the Sherman Act "by forcing the [defendant's] policy into the 'boycott' pigeonhole," particularly where doing so would "extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact ... is not immediately obvious." *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986). In this context, the Fifth Circuit has noted that "in the course of deciding whether a business practice challenged under Section 1 fits within the 'boycott pigeonhole,' many courts find themselves in a detailed inquiry into the economic effects of the practice—precisely the sort of 'rule of reason' analysis the *per se* approach is supposed to eliminate for 'obviously' anticompetitive reasons." *Consolidated Metal Products v. American Petroleum Institute,* 846 F.2d 284, 290 n. 16 (5th Cir.1988). Indeed, the Supreme Court has recently held that in alleged cases "there is a pre-sumption in favor of a rule-of-reason standard." *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808 (1988).

In *Northwest Stationers,* the Supreme Court summarized the circumstances in which the *per se* rule is generally applied to alleged group boycott activity. The Court stated that such cases

> have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firms possessed a dominant position in the relevant market. In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive.

472 U.S. at 294, 105 S.Ct. at 2619 (citations omitted).

The Court, reemphasizing its admonition voiced in *Broadcast Music* that a literal application of the *per se* categories should be avoided, 441 U.S. at 8–9, 99 S.Ct. at 1556–57, held that a plaintiff alleging a group boycott "must first present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." 472 U.S. at 298, 105 S.Ct. at 2621. The Court cautioned that "[t]he mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Id.*

■ Apex has not conclusively established that it was subjected to a "practice [which] facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music,* 441 U.S. at 19–20, 99 S.Ct. at 1562. In short, it has not overcome the presumption that a rule of reason analysis should be applied to the facts of this case as known "by merely labeling the defendant's conduct a concerted refusal to

deal." *Registered Physical Therapists, Inc. v. Intermountain Health Care, Inc.,* No. 86–C–0076j, 1988 WL 125788 (D. Utah Sept. 6, 1988) (LEXIS Genfed library, Dist. file); *Broadcast Music,* 441 U.S. at 24.

Apex has not proved "the touchstone of *per se* illegality [-] that [its] customers or suppliers ... had, as a group, agreed or been forced to cease doing business with [it]." *Consolidated Metal Products,* 846 F.2d at 291. It is undisputed that Apex was able to enter the relevant market and that it did fulfill its contractual obligations. Apex purchased 32% of its immediate oil needs from the long defendants, but also found ready suppliers for the other 68% of its immediate requirements, albeit at a price above that prevailing just before Apex sought to purchase the oil. Apex simply was not frozen out of the relevant market and can hardly challenge the conclusion that any harm to competition—as opposed to harm to Apex—"is not immediately obvious." *Indiana Federation of Dentists,* 476 U.S. at 459, 106 S.Ct. at 2018. Further, defendants, as discussed *infra,* put forth an argument, as to which the Court determines material factual disputes exist, that the resulting market conditions were caused by Apex, not by the long defendants. In sum, for Apex to prevail here on its claim that it was the victim of a concerted refusal to deal, it will have to establish that joint action occurred which resulted in an unreasonable restraint of trade—it cannot invoke the *per se rule* in this case.

Apex may establish that joint activity occurred resulting in an unreasonable restraint of trade by proof of *"either* an unlawful purpose or an anticompetitive effect." *McLan v. Real Estate Board of New Orleans,* 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980) (citations omitted) (emphasis in original). Apex has made a barely sufficient showing that a material factual dispute exists as to the anticompetitive effect of the alleged *conspiracy* in this count. Apex has shown that the long defendants did possess a real degree of market power, and has submitted facts from which an inference may be drawn that the defendants purposefully

dealt with Apex in a manner designed to raise the market price for oil in an otherwise declining market, thereby possibly injuring competition. This showing, while staving off the motion for summary judgment, will of course be reviewed again following the receipt of the live testimony at trial to determine whether this claim should be given to the jury. Belcher's motion for summary judgment on count two of the complaint is denied.

As to the third count, Apex's allegations are again supported by a shaky foundation, one which, if not buttressed considerably at trial, would likely fall. Apex has alleged that the long defendants not only conspired against it but induced or attempted to induce others to boycott Apex.

The frequent difficulty of proving a conspiracy needs no extended comment. Proof becomes even more difficult where, as here, the universe of possible co-conspirators is populated by those whose self-interest might lead them to take action, without any knowledge of the conspiracy, that would be identical to the action an actual co-conspirator would take. In other words, as Apex's distress became known to the general market, any individual oil supplier might have independently concluded that it could charge Apex more than the going rate for oil. On the other hand, the long defendants might have attempted, perhaps successfully, to induce others to squeeze Apex or to signal to others that a squeeze of Apex was possible.

Belcher's motions for summary judgment on counts two and three are denied.

### D. *Claim under § 2 of the Sherman Act (count four)*

Belcher moves for summary judgment dismissing Apex's fourth count. Apex alleges that the long defendants conspired to monopolize the futures and cash markets for oil in violation of § 2 of the Sherman Act. However, because proof of a specific intent to monopolize is lacking, the Court dismisses Apex's claim.

In order to prevail on a claim of conspiracy to monopolize, Apex must estab-

lish (1) the existence of a combination or conspiracy; (2) overt acts done in furtherance of the combination or conspiracy; and (3) a *specific intent to monopolize. See International Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 795–96 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 540–41 (7th Cir.1986). *See also Optivision Inc. v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 680 (N.D.N.Y.1979).

The Court assumes for purposes of this motion that Belcher, Northeast and Global reached an agreement to nominate for early delivery. However, there is no evidence that the object of the agreement was to monopolize either the wet or futures markets. Indeed, the only direct evidence is to the contrary.

Belcher and the other former defendants have expressly denied any intent to monopolize. Moreover, the record is devoid of circumstantial evidence from which such an intent could be inferred.

In the first place, the unlikelihood of achieving a monopoly in the circumstances of this case is manifest. Courts have held that the likelihood of success of acquiring and/or maintaining monopoly power is an appropriate consideration on the question of specific intent. In *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.,* 510 F.2d 1140, 1144 (2d Cir.), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975), the Second Circuit stated:

> Although specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved ... the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed.

*See also United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 612 n. 1, 97 S.Ct. 861, 863 n. 1, 51 L.Ed.2d 80 (1977); *Hunt–Wesson Food v. Ragu Foods, Inc.,* 627 F.2d 919, 927 (9th Cir.1980), *cert. denied* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *Optivision,* 472 F.Supp. at 680.

■ In this regard, it is important to emphasize that the evil toward which § 2 of the Sherman Act is targeted, monopoly power, is the impairment of competition through an unlawfully acquired market structure which allows the monopolist to exclude competition or to raise prices without being undercut. It does not address every restraint of trade which may be the subject of § 1 of the Sherman Act.

As Judge Kaufman stated in *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir.1979), *cert. denied* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980):

> The gravamen of a charge under § 1 of the Sherman Act is conduct in restraint of trade; no fundamental alteration of market structure is necessary. Thus, certain restrictive practices among competitors, such as price fixing, are illegal *per se.* That the conspirators lack the market power to affect prices is immaterial. *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811 [845], 84 L.Ed. 1129 (1940). Section 2, by contrast, is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence of competition.

■ In this case, while the alleged activities of the long defendants, both intended and completed, might amount to a restraint of trade, such activities could not amount to § 2 monopolization. There is no evidence that the markets for futures and cash products would be structurally altered. Both markets had dozens of participants. Both were vigorously competitive. There is simply no proof that defendants intended to alter the markets' nature or structure.

At most, defendants arguably planned to put Apex in a delivery bind for no more than a few business days from which they might extract premium prices. Apex has cited no case in which activity of such fleeting duration has supported a finding of a specific intent to monopolize. To the

contrary, such an intent has been found wanting in cases where the defendant has monopolized a market for many months but where a foreseeable time limit to such monopolization existed due to the planned entry of competition. *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243 (D.C.Cir.1987) (no intent to monopolize where a second source for defendant's product could not be found for a year); *Borough of Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307 (3rd Cir. 1982) (no monopoly power where plaintiff could enter market in 14 to 16 months); *Metro Mobile CTS, Inc. v. New Vector Communications, Inc.,* 661 F.Supp. 1504 (D.Ariz.1987) (a 17 month head start in supplying cellular phone service too short to permit finding of monopoly power).

In sum, the Court concludes that in the circumstances of this case, there is no triable issue of fact as to the essential element of the Sherman Act § 2 claim of specific intent to monopolize. Accordingly, the Court grants Belcher's motion for summary judgment on the fourth claim.

### E. *Claim under the Commodities Exchange Act (count five)*

In its fifth count, Apex alleges that the long defendants "and other aiders and abettors" took actions which "constituted . . . a manipulation, corner or squeeze or an attempted manipulation, corner or squeeze of the market for No. 2 Heating Oil for delivery . . . in February 1982. . . ."[8] Apex alleges that these actions violated § 9(b) of the CEA, 7 U.S.C. § 13(b), which imposes liability upon "any person [who] manipulate[s] or attempt[s] to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity. . . ."

Belcher moves for summary judgment on this claim, arguing that the long defendants did not possess the required market dominance and, therefore, as a matter of law, could not have cornered or even attempted to corner the market for February 1982 No. 2 Heating Oil. The Court agrees that the long defendants did not actually corner the oil market and dismisses that part of Apex's fifth count. However, the Court denies the motion as to that part of the fifth count alleging Belcher's attempted market manipulation.

First, where a long squeeze is alleged, it must be pleaded and proved "that the respondent accumulated a position in the futures market that exceeded the available deliverable supply." T. Russo, Regulation of the Commodities Futures and Options Markets, Sec. 12.11 at 12–22 (1983). It is well recognized that a long squeeze cannot be effected unless the defendants have market dominance. See *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1162 & 1164 (8th Cir.1971), *cert. denied* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); *Volkart Bros. v. Freeman,* 311 F.2d 52, 59 (5th Cir.1962); *G.H. Miller & Co. v. United States,* 260 F.2d 286, 289 (7th Cir.1958), *cert. denied* 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); *Great Western Food Distributors, Inc. v. Brannan,* 201 F.2d 476, 480–81 (7th Cir.), *cert denied,* 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953). Without market dominance, the longs have no ability to force a short to deal with them, since the short can go elsewhere to obtain the commodity and deliver. As the CFTC has stated:

> [t]he acquisition of market dominance is the hallmark of a long manipulative squeeze. For without the ability to force shorts to deal with him either in the cash or futures market, the manipulator is not able to successfully dictate prices because a short may buy [the commodity] from other sources and deliver against his commitments.

*In re Indiana Farm Bureau Assn, Inc.,* [1982–84 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 21,796 at 27,279 (C.F.T.C. Dec. 17, 1982). *See also Cargill,* 452 F.2d at 1164 ("a squeeze cannot be successfully executed unless a long has sufficient control of enough futures contracts to force the shorts to come to him to settle their

---

**8.** Amended Complaint at ¶ 77.

contracts."); P. Johnson, *Commodities Regulation,* Sec. 5.07 at 241 (1982).

There is a compelling reason to require that market dominance be established before a long can be held liable for a squeeze. It is well understood that many, if not most, market squeezes occur naturally and without unlawful activity. *See Indiana Farm Bureau,* ¶ 21,796 at 27,284 ("Some—or, in fact, most—squeezes are inevitable on both the physical and the exchange markets and are not the result of illegal manipulation") (citation omitted). Indeed, a squeeze may even be triggered by the activities of a short—as is alleged against Apex in this case—where the short concludes futures trading and proceeds into the delivery phase of an unliquidated short position without securing a supply sufficient to meet its contractual obligations. Where the squeeze is caused by market forces unrelated to long activity, the market dominance requirement will quite properly insulate the long from liability as it is not prevented from acting in its own self-interest to obtain the highest price. In this case, the alleged co-conspirators lacked market dominance in both the futures and cash markets. As to the futures market, when trading in February 1982 contracts for No. 2 heating oil ceased on January 29, 1982, Apex held 89.2% of the total open interest of short contracts, while the long defendants held only 29% of the total open long interest, of which Belcher held 6.4%.

■ Accepting a definition of available supply most favorable to Apex—that is, No. 2 heating oil obtainable on or after February 4 and deliverable to New York Harbor by February 6, 7, or 8—the alleged co-conspirators plainly did not control sufficient physical oil to permit a finding of market dominance. Belcher, Global, and Northeast demanded delivery in that period of 315 contracts, 362 contracts and 415 contracts, respectively, or a total of 1092 contracts or 1,092,000 barrels. Between February 4 and February 6, however, Apex purchased no less than 2,700,000 barrels of oil (equivalent to 2,700 contracts) for immediate delivery from entities *other than* Belcher, Northeast and Global.

Thus, even assuming that the entire New York cash market was represented by deals in which Apex was involved—an assumption necessarily favoring Apex—the deliverable supply exceeded Apex's requirements by 2.5 times. (These figures do not even include the 862,000 barrels of oil that Apex actually purchased from Northeast and Global). As a matter of law, the long defendants lacked the requisite market dominance to actually effect a long squeeze.

Apex argues further that the prior decision of the Court of Appeals allowing the commodities manipulation claim to proceed against Belcher precludes summary judgment on this claim now and that, in any event, since its commodities manipulation claim is grounded on a theory of conspiracy between Belcher, Global and Northeast, market dominance need not be proved.

■ First, the issue of market dominance was neither raised nor decided by the Court of Appeals, as it had not been raised nor decided by this Court, and thus the Court is not precluded from deciding that issue now. The Court similarly rejects Apex's argument that to the extent that its squeeze claim is based on a theory of conspiracy only, market dominance is not required. As stated in the Court's earlier opinion, 641 F.Supp. at 1275, where Apex argues alternatively that a squeeze actually occurred, market dominance is obviously a central issue, and where no market dominance is present summary judgment dismissing that portion of the claim is appropriate.

■ Moreover, the language of §§ 13(b) and (c) of the CEA does not impose liability simply for a "conspiracy to manipulate." Read together, the sections require either a completed manipulation or an attempted manipulation before liability may be imposed upon anyone.

§ 13(b) imposes liability on:

any person ... manipulating or attempting to manipulate, or [who] has manipulated or attempted to manipulate the market price of any commodity....

Unlike § 2 of the Sherman Act, which prohibits monopolization, attempted monopolization and, separately, a conspiracy to monopolize, there is no comparable "conspiracy to manipulate" offense.

The only discussion in the CEA of concerted action appears in § 13c(a):

> Any person who commits, or who willfully aids, abets, counsels, commands, induces or procures a commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations or orders issued pursuant to this Chapter, *or who acts in combination or concert with any other person in any such violation,* ... may be held responsible in administrative proceedings under this chapter for such violation as a principal.

7 U.S.C. § 13c(a) (emphasis supplied). A conspirator may thus be held liable under § 13c only when such conspirator acts with another in manipulating or in attempting to manipulate. *Cf., General Foods Corp. v. Brannan,* 170 F.2d 220, 231 (7th Cir.1948), (manipulation is "the creation of an artificial price ... whether *by one man or by a group of men.*") (emphasis supplied); *see also,* Russo, § 12.09 at 12–14. Indeed, in the related area of aiding and abetting liability, which arises under the same section, § 13c(a), the CFTC held that only those who knowingly participate *in a violation* of the Act may be held liable. *In re Richardson Securities, Inc.,* Comm. Fut.Law Rep. (CCH), ¶ 21.145 at 24, 639, 24, 646, n. 14 (CFTC 1981).[9]

■ As for Apex's claim that the long defendants attempted to manipulate the price of oil in the wet market, Belcher's motion for summary judgment is denied. While the long defendants did not have the market dominance necessary to actually corner the oil market and to effect a long manipulative squeeze, the Court cannot conclusively determine at this stage of the litigation that they might not have attempted to do so or otherwise taken steps resulting in an artificial price increase. Accordingly, Belcher's motion to dismiss count five is granted in part and denied in part.

### F. Conclusion as to Belcher's Summary Judgment Motion

The Court denies Belcher's motion for summary judgment on counts one through three. Belcher's motion for summary judgment on Apex's fourth count is granted. As for the fifth count, insofar as Apex alleges that the long defendants actually cornered the market for oil, Belcher's summary judgment motion is granted; insofar as the fifth count alleges liability for an attempt to manipulate the price of the commodity, summary judgment is denied.

### IV. APEX'S MOTION TO STRIKE BELCHER'S AFFIRMATIVE DEFENSES

In response to Apex's myriad allegations of wrongdoing, Belcher asserts seven affirmative defenses including lack of personal jurisdiction as to two of the Belcher defendants, failure to state a claim, lack of causation, assumption of the risk, unclean hands, self-inflicted injury and inequitable conduct. Apex now moves to strike all of Belcher's affirmative defenses pursuant to Fed.R.Civ.P. 12(f).[10]

The Court discusses each of Belcher's defenses in turn.

#### 1) Lack of personal jurisdiction

■ Belcher defendants The Coastal Corporation and Belcher Oil Company assert that this Court lacks personal jurisdic-

**9.** Conspiracy claims under § 10(b) of the Securities Exchange Act also require proof of the underlying securities violation. *See, Hill v. Equitable Bank, Natl. Ass'n,* 655 F.Supp. 631, 645–46 (D.Del.1987), *aff'd* 851 F.2d 691 (3rd Cir.), *cert. denied sub nom Data Controls North v. Equitable Bank Natl. Ass'n,* — U.S. —, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). In the common law, civil conspiracy without proof of the underlying tort is not actionable. *See, e.g., Demalco Ltd. v. Feltner,* 588 F.Supp. 1277 (S.D.N.Y. 1984).

**10.** Fed.R.Civ.P. 12(f) provides in pertinent part that a court "may order stricken from any pleading any insufficient defense...." Apex also moves to dismiss certain Belcher defenses pursuant to Rule 56(d). Rule 12(f), however, provides the proper framework for the Court's disposition of Apex's motion to strike Belcher's affirmative defenses.

tion over them. The other Belcher defendants do not contest the Court's personal jurisdiction.[11] This Court, per Judge Owen, has previously denied a motion by the two contesting defendants, among others, to dismiss them from this suit for want of personal jurisdiction. Apex asserts that such denial necessarily means that the contesting defendants can raise no triable issue of fact concerning this Court's personal jurisdiction over them and that their defense must be dismissed pursuant to Fed. R.Civ.P. 56(d). Apex's contention is meritless. Judge Owen made no specific findings of fact as to the issue of the contesting defendants' amenability to suit in this Court. Judge Owen simply denied without comment the motion as to the contesting defendants. "If the court denies a Rule 12(b)(2) motion without holding an evidentiary hearing, the movant is not barred from disputing the jurisdictional facts at trial." *Moore's Federal Practice*, ¶ 12.07 [2.-2] at 12–58 (1987); *see also, Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 58 (2d Cir.1981) ("In the absence of a full-blown hearing on the merits, plaintiff need make only a *prima facie* showing that the Court has jurisdiction under a long-arm statute . . . such a showing will not prevent the defendant from challenging the jurisdictional facts on the trial . . .") (citation omitted). Accordingly, the motion is denied.

### 2) Failure to state a claim

Apex moves to strike Belcher's defense that Apex has failed to state a claim on any count. The Court grants the motion to strike the defense.

A defense of failure to state a claim is in itself proper, of course. Fed.R.Civ.P. 12(b)(6), 12(h)(2). Here, however, the Court, in considering Belcher's summary judgment motion, has already determined that Apex's complaint is sufficient as to counts one through three and as to part of count five. *See, supra* §§ III.C, III.E; *see also Lehmann Trading Corp. v. J & H Stolow, Inc.*, 184 F.Supp. 21, 22–23 (S.D.N.

Y.1960) (defense of failure to state a claim stricken after court determined that complaint stated a claim for relief); *Laub v. Genway Corp.*, 60 F.R.D. 462, 466 (S.D.N.Y.1973) ("The analogies to the requirements for granting a motion to dismiss the complaint are apparent").

The motion to strike Belcher's defense of failure to state a claim is granted.

### 3) Lack of causation; 4) Assumption of the risk and 5) Self-inflicted injury

 Belcher's defenses of lack of causation, assumption of the risk and self-inflicted injury are merely denials of liability and not affirmative defenses. The Court strikes the defenses but notes, of course, that Belcher may offer proof at trial that Apex's misfortune resulted from its own business misjudgment or improper behavior.

### 6) Unclean hands

 For its fifth affirmative defense, Belcher asserts that "Apex is barred from recovery by reason of its unclean hands."[12] It is Belcher, however, that is barred from relying on Apex's alleged unclean hands as a defense to this action.

In *Kiefer–Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), an antitrust action brought by liquor wholesalers against suppliers who conspired to force the wholesalers to agree to maximum resale prices, defendants argued that the wholesalers had themselves conspired to set minimum resale prices and thus, by their unclean hands, forfeited their right to recovery from the defendants. The Supreme Court firmly rejected this argument, holding that "[t]he alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured." 340 U.S. at 214, 71 S.Ct. at 261 (citations omitted).

Since *Kiefer–Stewart,* the law has remained consistent that unclean hands is not a defense to an antitrust action. *See, e.g.,*

---

**11.** Memo in opposition at 34 n. 22.

**12.** Amended answer at ¶ 24.

*Ciminelli v. Cablevision,* 583 F.Supp. 158, 163 (E.D.N.Y.1984) ("The Supreme Court has held that unclean hands is not a defense to an antitrust cause of action. *Kiefer–Stewart* "); *Affiliated Music Enterprises v. Sesac, Inc.,* 17 F.R.D. 509, 511 (S.D.N.Y.1955) ("It now seems well established that 'unclean hands,' as such, does not constitute a defense to an antitrust action ... This is true even though plaintiff was violating the antitrust laws to defendant's detriment"). In *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968), the Supreme Court stated the law in the clearest terms: "We ... hold that the doctrine of *in pari delicto* ... is not to be recognized as a defense to an antitrust action." *See also Id.* at 138, 88 S.Ct. at 1984 ("There is nothing in the language of the antitrust acts which indicates that Congress wanted to make the common-law *in pari delicto* a defense to treble-damage actions").

Belcher, while conceding *Perma Life* 's "apparent" rejection of *in pari delicto* as a defense to an antitrust action, nevertheless argues that Apex's alleged wrongdoing should entitle Belcher to the unclean hands defense in order to enhance the public policy of deterring illegal anticompetitive behavior. Belcher's argument ignores the foundation on which both *Kiefer–Stewart* and *Perma Life* plainly rest. As the Court explained in *Perma Life,* 392 U.S. at 139, 88 S.Ct. at 1984,

> the purposes of the antitrust laws are best served by insuring that the private action will be an everpresent threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage contin-

ued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct. *Kiefer–Stewart* ....

*See also Chrysler Corp. v. General Motors Corp.,* 596 F.Supp. 416, 419 (D.D.C.1984) ("The public interest in preventing anticompetitive injury would be dampened tremendously if defendants were allowed to raise the defense of unclean hands in antitrust actions brought by private parties").

The Court grants Apex's motion to strike Belcher's defense of unclean hands.

### 7) Inequitable behavior

Apex's alleged inequitable behavior provides the basis for both Belcher's seventh affirmative defense and its first amended counterclaim. The alleged offending behavior detailed in these paragraphs is apparently the same behavior which underlay the stricken defense of unclean hands. As explained above, such an affirmative defense is unavailable to Belcher, however named. The defense is stricken.

## V. APEX'S MOTION TO DISMISS BELCHER'S COUNTERCLAIMS

### A. *Introduction*

Apex moves for summary judgment against Belcher on its five counterclaims. The gravamen of the claims is that Apex, not Belcher, attempted to manipulate and monopolize the futures and wet markets for No. 2 heating oil. Belcher alleges that between January 18, 1982 and February 1982, Apex and others purposefully attempted to and did manipulate downward the price of oil on the Exchange and on the wet market. Belcher alleges specifically that Apex drove down the price of futures contracts by selling many such contracts, amounting to nearly 90% of the total open interest at the close of trading, without the means to make immediate delivery. In furtherance of its scheme, Belcher alleges, Apex attempted to buy back February contracts "off the Exchange" after the closing of the trading period to avoid the publicity of sales on the Exchange. Additionally, Apex allegedly issued false statements that

it had sufficient oil on hand to meet its delivery obligations. Finally, Belcher alleges, in order to "cover up" its scheme, Apex brought the instant action. Belcher now alleges damages of over $3 million from Apex's alleged downward price manipulation.

Belcher alleges violation of §§ 4(b) and 9(b) of the CEA, violation of § 2 of the Sherman Act, common law fraud, and violation of §§ 340 and 352–c of New York's General Business Law. For the reasons stated below, the Court grants in part and denies in part summary judgment against Belcher on the first counterclaim. Apex's motion to dismiss Belcher's second counterclaim is denied. The Court grants summary judgment against Belcher on its third through fifth counterclaims.

### B. Inequitable behavior and violation of the CEA

Belcher's first counterclaim is inartfully drawn and, as a result, the Court has difficulty in distinguishing the specific nature of the claim. In the penultimate paragraph of the claim, Belcher alleges that Apex violated §§ 4(b) and 9(b) of the CEA. In the concluding paragraph, Belcher asserts that Apex's inequitable behavior bars it from recovery on any of its claims.

First, the assertion that Apex's inequitable behavior bars it from any recovery is not properly a counterclaim. It is a defense, and one which is unavailable to Belcher, as the Court determined above at § IV.7. In any event, insofar as the counterclaim relates to Apex's alleged inequitable behavior, it is dismissed.

The Court construes the remainder of the counterclaim to allege violations of the CEA, specifically that Apex attempted to artificially depress the price of oil on the futures and wet markets by entering into many short contracts without the ability to make good on those contracts.[13] In es-

sence, Belcher argues that when Apex sold enormous numbers of short contracts between January 18, 1982 and January 29, 1982, it "dr[ove] down the price by creating the false appearance that there was a huge volume of [oil] available for delivery in early February in New York Harbor."[14] The misinformation was compounded, Belcher alleges, when Apex failed to cause its broker to liquidate its outstanding short positions at the close of trading on January 29, 1982. Belcher further alleges that "Apex' [sic] manipulative scheme ended when the market learned accurate information about the deliverable supply, returning prices to a competitive level."[15] Belcher is not specific about when the market returned to normal, but presumably that was after "the second phase of [the] manipulation—from February 1 [1982] until [Apex's] false statements were discovered at the end of the first week of February...."[16]

Apex correctly argues that it cannot be held liable if futures or wet market prices dropped simply because of its sale of short contracts. That the market work in its usual way is precisely the object of the laws against market manipulation. However, the Court cannot yet state with the necessary certainty that Apex did not attempt to manipulate either of the two markets; in other words, material factual disputes exist. For example, from Apex's failure to liquidate its open position on January 29, 1982, it is possible to draw an inference that Apex's huge short position was developed with the intent to drive prices down, regardless of Apex's present ability to deliver under the contracts. Further, was Apex's failure to close out its trading position on January 29, 1982, combined with any later misstatements to the Exchange about its ability to deliver oil, designed to keep futures and cash prices depressed? As the Court discusses at greater length *infra* at § V.A,

---

13. Apex characterizes Belcher's claim as alleging that Apex attempted a short-side squeeze. Belcher, however, states that it "has not alleged a corner or any manipulation requiring cash market dominance." Belcher's Memo in Opposition at 17.

14. *Id.*

15. *Id.*

16. *Id.* at 23.

Apex's intent in making any misleading statements to the Exchange is still in doubt. Additionally, Belcher raises an important issue when it asserts that Apex knew that the market takes a failure to liquidate as a signal that delivery can be made because a long has the right to demand delivery and refuse settlement by book transfer or EFP. In the face of this, Apex cannot argue that there is no material dispute as to whether it manipulated market prices.

The Court also notes that Belcher, in its papers, barely differentiates between the alleged effect of Apex's conduct on the futures market and on the wet market. They are distinct markets that must be considered separately and Belcher will need to do this at trial. However, there is also a serious question as to Belcher's handling of its argument that it was injured in part by its sale of oil on the wet market at artificially depressed prices. On the one hand, as noted, *supra* at note 13, Belcher admits that it is not alleging a short-side squeeze by Apex and thus is not alleging Apex's dominance of the wet market. If there was no short-side squeeze, why then did wet prices drop? Belcher alleges that Apex in effect conveyed a false signal to the market, when it sold short contracts and failed to liquidate open positions, that Apex could deliver and thus there was new supply available. Therefore, prices in the wet market should have been affected in some way reasonably related to the amount of new supply that was believed to be available.

But how is one to draw the connection between the erroneous belief in the newly available supply and the decline in price? At this point Belcher has provided few clues. For example, in explicitly declining to argue that Apex attempted to effect a short-side squeeze, Belcher also implicitly declined to argue that the market believed such a squeeze might be in the offing and that prices dropped in anticipation of the squeeze. If Apex was not dominant in the wet market and no one believed Apex was, how can a general decline in the wet market price be attributed to a manipulation by Apex? Or is Belcher merely trying to draw a fine distinction that Apex was not powerful enough in the wet market to "squeeze" the market but was powerful enough to drive the price down to some degree? At trial Belcher will have to do more than merely allege that Apex did possess enough power to move the market in measurable ways while admitting that its market power was limited.

Apex's motion for summary judgment on Belcher's first counterclaim is granted as it relates to a claim of inequitable behavior but is denied as it relates to alleged violations of the CEA.

### C. *Common law fraud*

■ Belcher's second counterclaim alleges Apex's common law fraud. To prevail under New York law on a claim of common law fraud, a plaintiff must prove that 1) the defendant made a false representation of a material fact; 2) the defendant intended to deceive; 3) the plaintiff justifiably relied upon the misrepresentation; and 4) the plaintiff was injured on account of such reliance. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981), *appeal after remand*, 717 F.2d 683 (1983). As the Court has noted, there is a dispute regarding Apex's intent in making certain misstatements to the Exchange regarding its ability to deliver oil under the contracts. There is also a dispute about Apex's intention in failing to liquidate a large open position at the end of the trading period perhaps without having had the resources to deliver in full under the contracts at that time.

Because material factual disputes exist as to the truth of the allegations in this counterclaim, Apex's motion for summary judgment is denied.

### D. *Violation of the Martin Act*

■ For its third counterclaim, Belcher alleges that Apex's conduct constituted a fraud in the sale of commodities in violation of New York General Business Law § 352–c. However, in *CPC International, Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 806, 514 N.E.2d 116, 117

(Ct.App.1987), the New York Court of Appeals held that "there is no private right of action for violations of the antifraud provisions of the Martin Act (General Business Law § 352–c)...." *See also Green v. Santa Fe Industries, Inc.*, 70 N.Y.2d 244, 519 N.Y.S.2d 793, 798, 514 N.E.2d 105, 109 (Ct.App.1987) ("there is no implied private action for fraudulent acts under section 352–c ..."); *The Ltd., Inc. v. McCrory Corp.*, 683 F.Supp. 387, 397 (S.D.N.Y.1988). Consequently, the Court dismisses Belcher's third counterclaim.[17]

### E. *The Monopolization claims*

§ 2 of the Sherman Act and § 340 of the Donnelly Act

Belcher's fourth and fifth counterclaims charge Apex with both attempted and completed monopolization of the futures market for February 1982 No. 2 heating oil, in violation of § 2 of the Sherman Act and of § 340 the New York General Business Law, known as the Donnelly Act. The Court need merely quote Belcher's admission that "to the extent that the Court accepts [Belcher's] 'lack of durable market power' argument addressing Apex' [sic] fourth claim (a conspiracy to monopolize), Belcher's monopolization claims must also be dismissed." [18] In § III.D, *supra,* the Court did accept Belcher's argument and dismissed that count of Apex's complaint in its entirety.

The Court dismisses Belcher's fourth and fifth counterclaims.

## VI. APEX'S AND THE EXCHANGE'S CROSS–MOTIONS FOR SUMMARY JUDGMENT ON THE EXCHANGE'S COUNTERCLAIMS

### A. *Common law misrepresentation*

The Exchange and Apex cross-move for summary judgment on three of the Exchange's counterclaims against Apex. The Exchange's first two counterclaims, although stated separately, are treated together by the Exchange and, thus, by the Court. The Exchange alleges that Apex is guilty of "common law misrepresentation concerning Apex's ability to make delivery" under its contractual obligations.[19] The Exchange specifically alleges that Apex failed to liquidate its short position before trading ended when it did not have the oil to make delivery, and that Apex, through its broker, misrepresented to the Exchange its ability to meet its obligations on the first possible date delivery would be due. The Exchange alleges that this failure to liquidate, as required by Exchange rules, and the misrepresentations following the failure to liquidate constitute the common law misrepresentations.

In its summary judgment motion, Apex alleges that Exchange Rule 54.02 did not apply to it and that, in any event, Apex did not violate the Rule because it did not default on its contractual obligations either to deliver the oil or to settle the contracts. Additionally, Apex argues that any misrepresentations it might have made to the Exchange were immaterial because it did not default on the contracts and the Exchange suffered no injury.

The Court denies both parties' motions.

▆ As an initial matter, Apex and the Exchange disagree on whether these allegations of fraud are to be tested under federal common law or New York law. Although the elements of fraud to be proved under either law are similar and although under either standard the cross-motions fail, because the Supreme Court has been quite clear regarding when feder-

---

**17.** Although *CPC International* was decided six months before the instant motion was made, neither Apex nor Belcher has cited the case even once in any of the voluminous papers submitted relating to the motion. While Apex is free to disregard the decision that ensures the granting of this aspect of its motion, Belcher is under an obligation to bring to the attention of the Court a decision clearly necessitating dismissal of its claim. Model Code of Professional responsibility DR 7–106(B) (1981) ("In presenting a matter

to a tribunal, a lawyer shall disclose: Legal authority in the controlling jurisdiction known to him to be directly adverse to the position of his client and which is not disclosed by opposing counsel....").

**18.** Belcher's Memo in Opposition at 28 n. 16.

**19.** Exchange Memo in Support at 4.

al common law is to be substituted for state law, resolution of the issue is necessary. The Court concludes that this action does not implicate the interests which might favor resolution of the counterclaims by federal common law.[20] Thus, the Court determines the motion with reference to New York state law.

■ As noted, the Exchange must establish that Apex made a false representation of a material fact which was intended to deceive it, upon which it justifiably relied and as a consequence of which it was injured. *Mallis*, 615 F.2d at 80. The Exchange argues in its reply brief that " '[g]ood faith' should mean accurate representations of fact."[21] As the Exchange well knows, the "good faith" inquiry is subjective, examining intent; it is not simply result-oriented, comparing declaration and actual fact. While it is undisputed from the record that Apex did make or caused to be made statements regarding its ability to meet its obligations to the longs, the fact that the statements turned out to be false does not prove, without more, that they were uttered with the intent to deceive.

The Court holds that a material factual dispute exists as to Apex's intent at the time it made or caused to be made certain statements to the Control Committee. Apex does deny that the statements were made with the intent to deceive. Further, there is testimony from Apex employees that they contacted Amoco to request delivery of oil Apex stated was owed to it and that Apex's broker informed the Control Committee that Apex was having trouble securing the oil from Amoco.

However, apart from its discussions regarding Amoco, in its brief Apex does not point to other instances which would dispute the Exchange's contention that Apex must have known that it could not, at that point, satisfy its obligations to the longs.[22] Apex's argument, advanced in several different forms, that the "emergency" was caused by a conspiracy and not Apex's alleged misrepresentations, is irrelevant to the Exchange's allegation that misrepresentations were made, whatever may have led to the circumstances prompting the alleged misrepresentations. Similarly, the illogic of Apex's contention—that because nomination dates and places of delivery were ordinarily flexible, the Exchange could not have relied on Apex's statements—requires no extended comment.

The Exchange's motion for summary judgment on its counterclaims of common law misrepresentation is denied.

■ Apex's summary judgment motion fares no better. As was implicit from the discussion above, the Court rejects Apex's contention that the counterclaims must fail because Apex did not default on the contracts. Rule 54.02 requires a short such as Apex either to have heating oil or a commitment to obtain heating oil on the first possible delivery date under any contract, or to liquidate the short position at market price before the end of trading. Apex's argument that its intention to enter into an EFP would satisfy Exchange rules would be tenable only if Exchange rules permitted a short to insist on entering into an EFP rather than delivering the oil. In fact, Exchange rules require an agreement be-

---

**20.** *See, e.g., Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (discussing selected instances such as the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases, where "our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control").

**21.** Reply at 10.

**22.** Although heavily relied upon by Apex, the Court does not view Apex's statement that it told the Control Committee that it was "pursuing the EFP/book transfer route" to provide a material factual dispute. This circular reasoning—in effect, "we did not lie about our ability to deliver because we said we were attempting to settle"—alone would not save Apex from summary judgment against it. Additionally, Apex could not rely on an EFP or book transfer to rescue it from its delivery obligations absent agreement by the longs.

tween the parties to enter into an EFP. If matched longs chose not to resolve the contracts in this fashion and insisted upon delivery—as was their right under Exchange rules—a short without actual product on hand or commitments to obtain product could default, precisely the evil the Exchange rules are designed to avoid.

Apex has also argued forcefully that Rule 54.02 by its terms applies only to clearing members and not to traders such as Apex. Resolution of Apex's motion need not rest on this argument, however, as the Exchange has asked that its counterclaims be treated together.

Apex's motion for summary judgment against the Exchange on its common law misrepresentation counterclaims is denied.

## B. *Attorney's Fees*

Apex and the Exchange cross-move for summary judgment on the Exchange's counterclaim for recovery of its attorney's fees in the suit brought by Apex against it, since dismissed.

The Exchange's counterclaim is based on Exchange Rule 58.02 which provides that

[a]ny *member* who institutes a law suit or proceedings on Exchange matters against the Exchange . . . in any court of law or equity and who fails to prevail in such lawsuit or proceedings, shall pay to the Exchange any and all expenses incurred and disbursements made by the Exchange, including reasonable attorney's fees, in connection with the defense of such suit or proceedings, in addition to such statutory costs incurred by such *member* in the judgment.

(emphasis supplied).

Apex, of course, lost its suit against the Exchange. The Exchange now argues that although Apex is not itself an Exchange member, it can fasten liability on Apex through Apex's wholly owned subsidiary St. Louis Commodities Corp. ("SLCC"), which is an Exchange member. The Exchange alleges that SLCC was no more than Apex's alter ego and that the Court should pierce the corporate veil to hold Apex liable.

In its summary judgment motion, Apex denies that SLCC was its alter ego and argues that the Exchange had full knowledge that it was contracting solely with SLCC and not with Apex when it admitted SLCC to Exchange membership.

▆ Apex and the Exchange again disagree as to whether federal common law or New York law applies to the claim. The Exchange argues that federal common law applies to the counterclaim, under which standard no fraud need be shown by the subsidiary to pierce the corporate veil. Apex maintains that New York law applies and that the Exchange's failure to establish SLCC's fraudulent conduct in respect to the transactions at issue must result in dismissal of the counterclaim.

The Exchange contends that because Exchange Rule 58.02 was approved by the Commodity Futures Trading Commission ("CFTC") and because the Exchange is bound under federal law to enforce all CFTC-approved rules, the rule itself must be interpreted according to federal common law, displacing the state law by which contract claims are traditionally determined.[23] As with the Exchange's first counterclaims, however, resolution of this contract claim must be by reference to New York law.

Other than that the Mercantile Exchange is federally regulated and its internal rules are federally approved, the Exchange presents no convincing argument that Congress wished federal courts to develop a body of federal common law with which to adjudicate claims between the Exchange and Exchange members based on internal Exchange rules. Further, while "federal regulation of commodity exchanges is much more extensive than it used to be, no reason is suggested why adjudication by state courts of the contract disputes among members of those exchanges should be expected to interfere with the current federal

---

**23.** Both parties concede that Exchange Rules constitute a binding contract between the Ex- change and its members.

regulatory scheme...." *Bernstein v. Lind–Waldock & Co.*, 738 F.2d 179, 184–85 (7th Cir.1984). Additionally, federal courts "have no special gifts for developing a body of contract law that will govern the internal disputes of the exchanges better than they are governed by state contract law...." *Id.* at 185. *Cf. Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234, 1244–45 (D.C.Cir.1978) (rules governing New York Stock Exchange do not create implied private rights of action under federal law). The Court, therefore, determines the present dispute under New York law.

■ Piercing the corporate veil is an equitable remedy allowing one injured by the fraudulent action of a subsidiary corporation to look to the parent corporation for redress.

> Control is the key. The parent must exercise complete domination "in respect to the transaction attacked" so that the subsidiary had "at the time" no separate will of its own, and such domination must have been used to "commit fraud or wrong" against plaintiff, which proximately caused plaintiff's injury. *Lowendahl v. Baltimore & Ohio R.R.*, 247 A.D. 144, 157, 287 N.Y.S. 62 (1st Dept.), *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936), *quoted with approval in Gorrill v. Icelander/Flugeidir*, 761 F.2d 847, 853 (2d Cir. 1985).

*American Protein Corp v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied* —— U.S. ——, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *see also Cameron Equipment Corp. v. People*, 297 N.Y.S.2d 326, 329, 31 A.D.2d 299 (4th Dept.1969), *aff'd*, 27 N.Y.2d 634, 313 N.Y.S.2d 763, 261 N.E.2d 668 (1970) (control must be established "in respect of the transaction attacked" so that "as to this transaction [the entity] had at the time no separate mind").

Here, the Exchange has not presented any material factual dispute as to whether SLCC was involved in any way in the transaction attacked. It is one thing for the Exchange to argue that an SLCC suit had failed or that SLCC had defrauded it, and quite another to argue that although Apex brought the suit and although SLCC was not involved in the disputed transactions, because SLCC was *otherwise* a mere instrumentality of Apex, liability attaches to Apex. The Exchange argues, in effect, that because Apex controls a member, whatever Apex does, even in its own name, it does as a member, subject to the rules regulating members. There is no evidence, however, that at the time of the Exchange–SLCC agreement, Apex agreed to be bound by the provisions of the agreement when acting independently of SLCC.

Fastening liability on Apex under the Exchange's theory would turn the doctrine of piercing the corporate veil on its head. As stated, this equitable doctrine prevents parents from shielding themselves from liability for wrongful acts committed by subsidiaries they control. The doctrine is not a means to enable a third party to invoke the terms of an agreement between the subsidiary and the third party whenever the parent takes action that if taken by the subsidiary would be covered under the agreement. If the Exchange wished to protect itself from incurring costs in a suit brought by Apex, it should have negotiated such a provision in its agreement with SLCC.

The Court grants summary judgment in favor of Apex and dismisses the Exchange's counterclaim.

## VII. SUMMARY OF CONCLUSIONS

The Court denies Belcher's summary judgment motions as to counts one through three of Apex's amended complaint. The Court grants Belcher's motion to dismiss count four. As to count five, summary judgment is granted in part and denied in part.

The Court grants Apex's motion to strike all of Belcher's affirmative defenses except the first.

Apex's motion for summary judgment against Belcher on Belcher's first counterclaim is granted in part and denied in part. The Court denies Apex's motion to dismiss Belcher's second counterclaim, but grants the motion to dismiss Belcher's third through fifth counterclaims.

The Exchange's motion for summary judgment on its counterclaims is denied. Apex's motion to dismiss the Exchange's common law misrepresentation counterclaim is denied but the motion to dismiss the Exchange's counterclaim for attorney's fees is granted.

SO ORDERED.